FRANK J. TAYLOR, ADMINISTRATOR, APPELLANT, V. JACK KOENIGSTEIN, APPELLEE.

FILED APRIL 26, 1935. No. 29162.

810

*Webb Rice* and *Taylor & Spikes*, for appellant.

*Kelsey & Kelsey, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE and CARTER, JJ.

PER CURIAM.

This action was originally brought after the death of Edmund H. Sattler by the duly appointed administrator of his estate against Jack Koenigstein as sole defendant. Two causes of action are set forth in the petition filed. In both, Sattler, the decedent, is alleged to be an incompetent, in the following language: "That said Sattler was an incorrigible spendthrift, and at the time of receiving said cash (April 11 to 15, 1930), and for several years immediately prior thereto had been a habitual drunkard and dipsomaniac, and was wholly incompetent to care for, conserve and manage said estate."

The first cause of action was based upon an alleged overcharge for services as attorney at law in the sum of $1,142.75 made by Boyle & Koenigstein, a firm of attorneys of which the defendant was a member.

The second cause of action set forth that by reason of certain acts of commission and omission on the part of Koenigstein, stated at length, the decedent sustained a loss of $5,000.

Answer was filed by the defendant, taking issue with

the allegations of plaintiff's petition, but admitting certain facts. To this answer plaintiff replied.

On these issues a jury was impaneled and sworn, and plaintiff introduced his evidence in chief. Thereupon the court sustained defendant's motion that the jury be discharged and the action proceed as one in equity.

At the close of all the evidence the district court entered a general finding in favor of defendant and against plaintiff, and dismissed the action.

The cause is now presented on appeal for trial *de novo* by plaintiff, appellant, on the theory that it is a cause of action to charge defendant Koenigstein as guardian *de son tort* or trustee *in invitum* with approximately $6,000 of decedent's money, of which the defendant had charge as a voluntary trustee or guardian for said decedent, shortly preceding the decedent's death in June, 1930.

A careful reading of the record sustains the conclusion that plaintiff's decedent, in his lifetime, was properly described as a "spendthrift." For the purposes of this opinion, this term will be defined as "One who spends money profusely or improvidently; a prodigal; one who lavishes or wastes his estate." Webster's New International Dictionary (2d ed.) Unabridged.

In 1866 there was duly adopted by the territorial legislature an act entitled "An act for revising, amending, consolidating and reenacting the Civil and Criminal Codes, and the Laws of a general nature, of the territory of Nebraska." Rev. St. 1866, p. 1. Section 40, ch. 23 of this enactment (now Comp. St. 1929, sec. 38-301) provided: "The word 'spendthrift' in all its provisions relating to guardians and wards, contained in this or any other statute, is intended to include every person who is liable to be put under guardianship on account of excessive drinking, gaming, idleness or debauchery."

The characteristics of spendthrifts have occupied the attention of the lawgivers and judges from the earliest time. Thus, Blackstone says: "In this case of idiots and luna-

tics, the civil law agrees with ours, by assigning them tutors to protect their persons, and curators to manage their estates. But, in another instance, the Roman law goes much beyond the English. For, if a man, by notorious prodigality, was in danger of wasting his estate, he was looked upon as *non compos,* and committed to the care of curators or tutors by the prætor. And, by the laws of Solon, such prodigals were branded with perpetual infamy. But with us, when a man on an inquest of idiocy hath been returned an unthrift, and not an idiot, no further proceedings have been had. And the propriety of the practice itself seems to be very questionable. It was doubtless an excellent method of benefiting the individual, and of preserving estates in families; but it hardly seems calculated for the genius of a free nation, who claim and exercise the liberty of using their own property as they please. *'Sic utere tuo, ut alienum non lædas,'* is the only restriction our laws have given with regard to economical prudence. And the frequent circulation and transfer of lands, and other property, which cannot be effected without extravagance somewhere, are perhaps not a little conducive towards keeping our mixed Constitution in its due health and vigor." 1 Cooley's Blackstone (3d ed.) *306.

Without approval of the reasons so assigned by Blackstone, it may be said that this was in truth the common law which the colonists brought with them and which we have under limitations stated in the act adopted. Comp. St. 1929, sec. 49-101.

However, to remedy this situation, and to provide a measure of protection to the spendthrifts and their dependents, remedial legislation was enacted in the several colonies and their successor states as early as 1783. Massachusetts adopted legislation in purpose and effect quite similar to the provisions of chapter 23 of the territorial Laws of Nebraska, passed and approved in 1866, and which now appear as sections 38-301 to 38-306, inclusive, Comp. St. 1929.

In passing upon Massachusetts acts, its courts, long prior to the adoption of similar legislation here, uniformly held that at common law there is no incapacity of spendthrifts, and in order to secure the benefits of these remedial enactments, their terms and conditions must be complied with. See *Smith v. Spooner,* 3 Pick. (Mass.) 229; *Manson v. Felton,* 13 Pick. (Mass.) 206; *O'Donnell v. Smith,* 142 Mass. 505.

Thus, in discussing this point the supreme court of Massachusetts, in *Manson v. Felton, supra,* says in part: "Lunacy or distraction, independent of any positive enactment, is itself a disability to contract, arising from want of capacity. In the case of a spendthrift there is no natural or mental incapacity, and, therefore, the incapacity by force of the statute itself, takes effect only from the appointment of the guardian, except the precise limited incapacity to make conveyances of property after a complaint filed and before proceedings upon it, declared by St. 1818, c. 60. * * * Now the invalidity of all grants and transfers of property by a lunatic or idiot does not arise from the appointment of a guardian, which supersedes the power of the owner, but from the natural incapacity, arising from want of mental power to contract; and this, not by force of the statute, but by well-known rules of the common law."

In *O'Donnell v. Smith, supra,* Holmes, J., (later of the supreme court of the United States), in delivering the opinion of the court, not only affirms the proposition that "there is no incapacity of spendthrifts at common law," but approves the doctrine that the terms of the controlling legislation must all be substantially complied with before the legal incapacity of the spendthrift is established. Further, in construing a statute, "which makes such appointment (of a guardian) a condition to its avoidance of transfers made by the spendthrift," Holmes, J., in effect, held that a judicial determination of this fact by a court of competent jurisdiction in a proper proceeding then pending before it, and the appointment by such court

of a guardian for the adjudicated spendthrift, but who died without qualifying or entering upon his duties, and where for nine years following such death no further steps were taken, was wholly insufficient to affect the legality of, or nullify, the transactions of such spendthrift.

So, it appears practically unquestioned in the authorities that "there is no incapacity of spendthrifts at common law; nor do the statutes so far liken them to insane persons as to create an incapacity apart from guardianship." 58 C. J. 1295.

A consideration of this principle is invoked by the evidence presented by the plaintiff in this case, and in particular the following: Exhibit 6, received in evidence upon offer by plaintiff, is a warrant of commitment in due form, issued by the board of insanity of Madison county, under date of June 15, 1929. It recites the making of an "investigation in due form of law," and that Edmund H. Sattler is found "to be a dipsomaniac and a fit subject for custody and treatment in the hospital."

Exhibit 7 discloses that Edmund H. Sattler was discharged from such commitment on July 13, 1929.

Exhibits 29 and 29a were offered in evidence and received over objections of defendant. Exhibit 29 is a warrant of commitment issued by the board of insanity of Holt county, Nebraska, in which it is recited that, "upon investigation in due form of law, * * * on April 22, 1930," the board "find Edmund Sattler to be an inebriate and addicted to excessive use of alcoholic liquor." Exhibit 29a is a certified copy of the record of the board of insanity of Holt county, Nebraska, of the hearing had before it on April 22, 1930, pursuant to which exhibit 29 was issued, and wherein Edmund Sattler was charged with insanity; that Sattler was represented by attorney; that Sattler was examined by the examining physician of the board, and the testimony of witnesses was taken; and the consideration of such evidence resulted in a finding "that there was insufficient evidence upon which to base a finding of insanity, but found, under the evidence,

that the said Edmund Sattler is an inebriate and a person addicted to the excessive use of alcoholic liquor."

As to the terms employed, Webster's New International Dictionary (2d ed.) Unabridged, defines "dipsomaniac" as "one affected with dipsomania," and the latter term as "a morbid and uncontrollable craving (often periodic) for drink, esp. alcoholic liquors; also, improperly, acute and chronic alcoholism." The term "inebriate" is likewise defined as "one who is drunk or intoxicated; esp. a habitual drunkard."

These proceedings, above referred to, were had under sections 83-742 to 83-748, Comp. St. 1929. These sections were enacted in 1905 as chapter 82 of the Session Laws of that year, under a title, "A bill for an act providing for the examination of dipsomaniacs, inebriates, * * * for the detention, care and treatment of such persons," etc. The act in terms was restricted to the person of those within its provisions, and did not assume to in any manner affect their property rights or relations.

Without determining the technical objection to the admission of these exhibits, it is obvious that, so far as concerns consideration in connection with the charge of being an "incorrigible spendthrift," they are wholly ineffective "to create an incapacity apart from guardianship." Considered in connection with the charge of being a habitual drunkard and dipsomaniac, they could in no manner affect or modify the long-established rule of this court: "To avoid a contract on the ground of drunkenness, it is not sufficient that the party was under undue excitement from liquor. It must arise to that degree which may be called excessive drunkenness, where a party is so far deprived of his reason and understanding as to render him incapable of understanding the character and consequence of his act." *Case Threshing Machine Co. v. Meyers,* 78 Neb. 685.

Further, "To avoid a contract on the ground of excessive intoxication, one must rescind the contract within a reasonable time after recovering his senses, or, if he has

received no money or property as a consideration therefor, he must, within a reasonable time, disclaim liability thereon." *Case Threshing Machine Co. v. Meyers, supra.*

See, also, *Johnson v. Phifer,* 6 Neb. 401; *Hauber v. Leibold,* 76 Neb. 706; *Benton v. Sikyta,* 84 Neb. 808; *Carroll v. Polfus,* 98 Neb. 657.

If the facts disclosed by the evidence in the instant case are sufficient to, at times, establish a condition of insanity, the test of mental capacity to contract is whether Sattler possessed sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he was engaged; and, in order to avoid a contract, it must not only appear that he was of unsound mind when it was made, but also that this unsoundness was of such a character that he had no reasonable perception or understanding of the nature and terms of the contract. See 32 C. J. 727.

In addition to this, the drunkenness or insanity that affects the validity of a contract must be of the time at which the transaction occurs, regardless of previous insanity or incapacity. Thus, a contract is binding if it is entered into in a lucid interval. See 32 C. J. 728.

As to the mental condition of Edmund H. Sattler, generally, the record indicates that he carried on a continued series of business transactions prior to the ones in suit, and even before his release from testamentary guardianship. These include the purchase and operation of automobiles, the purchasing and financing of a truck, the mortgaging of a part of his real estate to secure a loan of $5,000, a sale of his interest in a part of his inherited lands for a like amount, the sale of the cattle and equipment on a ranch in Holt county, Nebraska, the purchase and operation of a soft drink business at Pierce, Nebraska. Though most, if not all, of these transactions occurred while he was still under guardianship, and after he was married, the sufficiency of his mental powers in relation to the transactions referred to appears to have never been seriously challenged, either by his guardian,

his wife, or his friends. Yet, he was, during this period, frequently intoxicated, and when he had reached a certain degree of intoxication he was abusive, violent, uncontrollable, and maliciously destructive. As examples of this, it appears that he borrowed money and purchased a soft drink business at Pierce, Nebraska, and then later, in a condition of maudlin intoxication, he broke up and destroyed fixtures and stock, and ruined his enterprise. Again, he sold certain interests in land and invested the proceeds in a bootlegging venture. For this purpose he purchased two large automobiles, conducted them to Canada, secured a cargo of alcoholic liquors, successfully made the return trip and brought his contraband liquors into Holt or Pierce counties where they were "cached." Then he went on a "spree," and, in a drunken condition, drove one of the automobiles into O'Neill, Nebraska; with a cargo of illicit liquors aboard, where unknown parties, by force or theft, removed these liquors from his possession, and they were never recovered. The evidence indicates that a portion of the liquors that were "cached" were also stolen. The amount of the proceeds of liquors sold is not shown by the record. But it does appear that about this time, while still intoxicated, in drunken, uncontrollable fury, Sattler broke up and greatly damaged the two motor vehicles used in the bootlegging ventures, in the presence of his wife and relatives. Still, so far as is shown by the present record, he was not prosecuted for this unlawful transaction, and the proximate cause of his conceded losses was his habit of intoxication. The record contains evidence of witnesses to the effect that Sattler was an incompetent, but, with one exception, this opinion is based wholly on his habits of intemperance, and his qualities as a spendthrift. On the other hand, there is substantial evidence in the record that he was of normal mind. This, of course, relates to periods when he was not under the influence of intoxicating liquors. It is obvious that on this basis, to a degree, this apparently conflicting evidence may be harmonized. It is certain

that Sattler was a habitual drunkard and frequently became intoxicated to such a degree that he was, during the continuance thereof, wholly irresponsible. It is equally well established that there were other periods (when he was not under the influence of liquor) when he possessed and exhibited powers of mind ample to understand in a reasonable manner the nature and effect of the act or transaction in which he was then engaged. Therefore, it is obvious that the validity of each of the transactions in suit must be determined by the actual condition of his mind at the time they occurred.

In the light of the controlling principles above set out, and the conclusions of fact thus arrived at, an examination of the record discloses that, by the terms of his father's will, Sattler and his sister were placed under a testamentary guardianship until he arrived at the age of 26 years; that after he attained the age of 21 years, as construed by mutual consent of guardian and ward, the guardian's powers were not extended to his person, but were limited to his estate. This guardian was by order of the county court of Madison county, Nebraska, duly discharged on the 8th day of April, 1930, which order also directed a payment of $2,828.10 to be made by the guardian to Edmund H. Sattler. On April 8, 1930, the final report of the executor of the estate of Anna Sattler, deceased, was approved by the county court of Madison county, and such executor was by that court directed to pay to Edmund H. Sattler the sum of $14,189.55. The records of the county court disclose that the defendant, Jack Koenigstein, appeared as an attorney for Edmund H. Sattler in the hearings had upon the guardian's final report, and also in the hearing upon the final report of the executor.

On April 11, 1930, additional claims or credits of claims in favor of the executor, which had not been included in his final report, and which are itemized in the record and aggregate $2,014.20, were presented to and approved by Edmund H. Sattler, represented by his attorneys Boyle

& Koenigstein. Thereupon the executor deducted this sum of $2,014.20, as agreed upon, from the amount adjudged payable to Edmund H. Sattler. On that date, in settlement of the amounts due Sattler under the two decrees of the county court, two checks were drawn on the Norfolk National Bank, payable to Sattler's order, one of them for $2,328.10 drawn by his guardian, and the other for $12,175.35 drawn by the executor of his mother's estate. These checks were received by defendant Koenigstein, as one of the firm of Boyle & Koenigstein, attorneys, and as representative of Edmund H. Sattler, and in his presence, at the close of this negotiation. There is no evidence in the record of any intoxication of Sattler at the time of this transaction.

The record also establishes beyond dispute the existence of the following facts and circumstances, prior to the creation of the relation of attorney and client between Boyle & Koenigstein and Sattler:

On attaining his majority Sattler was desirous of terminating the powers of his testamentary guardian. For this purpose he commenced an action in the county court of Madison county. Neither Boyle nor Koenigstein was employed in this case. It appears that this litigation was ultimately settled and the testamentary guardian continued. A certain sum of money was advanced to Sattler in consideration of the settlement, and the compensation of his then attorney was provided for by the guardian.

The testimony of plaintiff's witness, Clara Patterson, who was Sattler's wife and had remarried after his death, is that when the time was approaching when, under the terms of his father's will, the testamentary guardianship would terminate, Sattler had a conversation with his guardian. As to what was said by the guardian the record before us does not indicate, but the evidence clearly establishes that the effect of these statements was to create in the mind of Sattler a decided belief that at the end of the period of testamentary guardianship an attempt would be made by his guardian to prevent him from

receiving his inheritance. In this connection the guardian admits that Sattler's competency was a subject of discussion between himself and the county judge at the time of rendering the final report. Also, there were several talks between the witness, Clara Patterson, and her husband at this time, on the subject of the continuance of the guardianship "after Mr. Pasewalk's time was up." This proposition, at all times, Sattler resented.

This witness, Clara Patterson, further testifies: "Mother and Dad said they were going to see that Edmund didn't get this money that was coming to him when he arrived at the age of 26 years, but he said if they did he was going to fix them." With this information in his possession, about three or four months prior to April 16, 1930, it appears that Edmund H. Sattler went to Norfolk, Nebraska, and called at the law office of Boyle & Koenigstein. He was received by Mr. Boyle of that firm in Boyle's private room. In the conversation that followed he employed the firm at an agreed compensation of $2,500 to secure for him his inheritance at the termination of the testamentary guardianship, as provided by his father's will. The amount involved exceeded $22,000. It may be said in passing that there is no evidence in the record attacking the reasonableness of the amount agreed upon, in view of this situation then believed to exist by the parties to the contract. After these arrangements had been made there was further talk between Mr. Boyle, Mr. Sattler, and Mr. Koenigstein. The evidence further clearly establishes that this employment marked the commencement of confidential relations between Sattler and Koenigstein.

However, neither Sattler's father-in-law nor mother-in-law had carried out their declared intention, and his wife had done nothing. The guardian had finally offered no serious objection. When Koenigstein received the checks which represented his client's inheritance, the substantial object of the employment of Koenigstein's law firm had been accomplished, but, in a large measure, the con-

test which had been reasonably expected and on the basis of which the services of this law firm had been contracted for had not materialized.

Mr. Boyle, who had been called away from Norfolk, returned about April 15, 1930, and on the next day, April 16, it was agreed by all parties to the engagement that the attorneys fees stipulated in the contract of employment, in consideration of subsequent developments, should be reduced from $2,500 to 5 per cent. of the amount recovered. The undisputed evidence in the record establishes that on the day of this transaction Sattler was not intoxicated, and was of sane mind. On this basis, it was agreed between the parties that the attorney fees amounted to $1,142.75, and a check for that amount in favor of Boyle & Koenigstein was made and delivered by Sattler. Thereupon Sattler received from his attorneys the entire amount of the recovery from the guardian and executor then remaining unpaid. The record further fails to disclose that Sattler ever questioned the validity of this settlement or the reasonableness of the attorney fees as finally agreed upon and paid. Also, the record contains no evidence which, in effect, tends to establish that the amount received by this law firm was, in view of their engagements and the results secured, unreasonable in amount.

Upon receiving this payment from his attorneys, Sattler at once sought to deposit the same in the Security State Bank of Norfolk. The officers of this institution wanted the deposit, but Sattler insisted upon some arrangement that would secure and protect his funds against the demands of his creditors. After some negotiations, by agreement of the interested parties, defendant Koenigstein was called up by telephone from the bank, and he came to the conference. There he finally acceded to the request, in which Sattler joined, which, in substance, was that Sattler would deposit all his present funds in the Security State Bank of Norfolk, and that this bank would issue to defendant Koenigstein certain nonnegotiable cer-

tificates of deposit, aggregating in amount the deposit thus made by Sattler, which Koenigstein agreed to hold, subject to Sattler's disposition, and particularly to deposit them to the credit of Sattler's checking account, when and as requested by Sattler. It appears that the ·money was thereupon deposited by Sattler, received by the bank, and the certificates of deposit issued and received by Koenigstein, who thereupon delivered to Sattler a signed memorandum or receipt, setting forth the substance of the transaction.

The affirmative evidence in the record is to the effect that at the time of this transaction Sattler was not intoxicated and was of normal mind, and his subsequent conduct amply sustains the deduction that he then knew and realized the nature of the transaction entered upon.

Subsequently, from time to time, these certificates were, at Sattler's demand, deposited to his credit in the Security State Bank until all of them received by Koenigstein had been redeposited as required by the agreement, and these proceeds had been paid out by the bank on the personal checks of Sattler. By necessary implication, the inference from the facts in the record is that Koenigstein in· this transaction neither retained nor used any of the moneys evidenced by the certificates of deposit received by him, nor any interest accruing thereon, nor was any compensation given him for his services. In passing, it may be said that the ethics of this transaction is not here for consideration; defendant Koenigstein predicates no demand for affirmative relief thereon; and in the present proceeding the rights of creditors, prejudiced by concealment, do not appear.

It is also fairly disclosed by the record before us that except as to the relation of attorney and client, as already set out, no confidential relations existed between Koenigstein and Sattler; that after this agreement of April 16, 1930, Koenigstein paid out no money for Sattler except to make these deposits in the Security State. Bank when and as directed; that he was never advised with or con-

sulted by Sattler on the subject of investments or business generally, and never sought nor exercised any control over Sattler's mind, his business transactions, or his property. This transaction, as was also the previous one, was entirely closed and terminated by Sattler prior to his death, and was by him never questioned or disaffirmed.

We have carefully examined the purchase by Sattler of the moving picture establishment at St. Paul, as disclosed by the evidence before us, and any participation therein by the defendant Koenigstein is negatived; and even knowledge on his part of facts in connection therewith sufficient to challenge his attention thereto is not established by the evidence.

In a case quite similar to the instant one, so far as controlling facts and contentions as to mental capacity are concerned, the supreme court of Iowa announced the following rule: "Where one who held securities belonging to another, adjudged an habitual drunkard, delivered them to him after the commencement of proceedings for the appointment of a guardian, he could not be held liable for the value of the securities by an heir of the incompetent, after his death; the appointment of a guardian not having been made at the time of the delivery." *McCoy v. Nuese,* 154 Ia. 563.

The reasoning of the Iowa court, set forth in the opinion referred to, as applied to the facts established by preponderating evidence in the instant case, is strikingly persuasive, and is adopted here.

It, therefore, follows that we determine on a hearing *de novo* that the evidence in the record before us amply sustains the findings and judgment of the trial court, and the same are

AFFIRMED.