Argued March 30, reargued June 30, affirmed September 30,
petition for rehearing denied November 4, 1964

# LILIENTHAL *v.* KAUFMAN

395 P. 2d 543

*Cleveland C. Cory,* Portland, argued the cause for appellant. With him on the briefs was George H. Fraser, Portland.

*Louis Schnitzer,* Portland, argued the cause and filed a brief for respondent.

Before ROSSMAN, Presiding Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

DENECKE, J.

This is an action to collect two promissory notes. The defense is that the defendant maker has previously

been declared a spendthrift by an Oregon court and placed under a guardianship and that the guardian has declared the obligations void. The plaintiff's counter is that the notes were executed and delivered in California, that the law of California does not recognize the disability of a spendthrift, and that the Oregon court is bound to apply the law of the place of the making of the contract. The trial court rejected plaintiff's argument and held for the defendant.

This same defendant spendthrift was the prevailing party in our recent decision in *Olshen v. Kaufman,* 235 Or 423, 385 P2d 161 (1963). In that case the spendthrift and the plaintiff, an Oregon resident, had gone into a joint venture to purchase binoculars for resale. For this purpose plaintiff had advanced moneys to the spendthrift. The spendthrift had repaid plaintiff by his personal check for the amount advanced and for plaintiff's share of the profits of such venture. The check had not been paid because the spendthrift had had insufficient funds in his account. The action was for the unpaid balance of the check.

The evidence in that case showed that the plaintiff had been unaware that Kaufman was under a spendthrift guardianship. The guardian testified that he knew Kaufman was engaging in some business and had bank accounts and that he had admonished him to cease these practices; but he could not control the spendthrift.

The statute applicable in that case and in this one is ORS 126.335:

"After the appointment of a guardian for the spendthrift, all contracts, except for necessaries, and all gifts, sales and transfers of real or personal estate made by such spendthrift thereafter

and before the termination of the guardianship are voidable." (Repealed 1961, ch 344, § 109, now ORS 126.280)

We held in that case that the voiding of the contract by the guardian precluded recovery by the plaintiff and that the spendthrift and the guardian were not estopped to deny the validity of plaintiff's claim. Plaintiff does not seek to overturn the principle of that decision but contends it has no application because the law of California governs, and under California law the plaintiff's claim is valid.

The facts here are identical to those in *Olshen v. Kaufman,* supra, except for the California locale for portions of the transaction. The notes were for the repayment of advances to finance another joint venture to sell binoculars. The plaintiff was unaware that defendant had been declared a spendthrift and placed under guardianship. The guardian, upon demand for payment by the plaintiff, declared the notes void. The issue is solely one involving the principles of conflict of laws.

We could quickly dispose of some of the conflict problems involved by applying principles previously stated some years ago by this court and other courts and writers. We are restrained from following this easy course for two reasons: First, "Contracts is by common consent the most complex and also the most confused part of Conflict of Laws." Restatement (Second), Conflict of Laws, Tentative Draft No. 6, p 1. "Conflict of laws was in a far more unexplored state than it is now when Professor Beale began work on the original Restatement of the nineteen-twenties." Reese, *Contracts and the Restatement of Conflict of Laws, Second,* 9 Int & Comp L Q 531, 532 (1960).

Second, the field of conflict of laws is today filled with judicial and pedagogical groping; the blazes of the future trail still remain faint and far apart. "In certain fields, as currently in Conflict of Laws, the wilderness grows wilder, faster than the axes of discriminating men can keep it under control." Traynor, *Law and Social Change in a Democratic Society*, 1956 Ill L For 230, 234.

Under these circumstances our duty is threefold,— to decide this case correctly, to indicate generally our views on the course to be taken in this particular part of the conflict of laws, but at the same time to refrain from making any pronouncements which might in the future restrain this court from taking a course which by that time has proved to be the most desirable.

Before entering the choice-of-law area of the general field of conflict of laws, we must determine whether the laws of the states having a connection with the controversy are in conflict. Defendant did not expressly concede that under the law of California the defendant's obligation would be enforceable, but his counsel did state that if this proceeding were in the courts of California, the plaintiff probably would recover. We agree.

■■ At common law a spendthrift was not considered incapable of contracting. *Taylor v. Koenigstein*, 128 Neb 809, 260 NW 544, 546 (1935). Incapacity of a spendthrift to contract is a disability created by the legislature. California has no such legislation. In addition, the Civil Code of California provides that all persons are capable of contracting except minors, persons judicially determined to be of unsound mind, and persons deprived of civil rights. § 1556. Furthermore, § 1913 of the California Code of Civil Pro-

cedure provides: "* * * that the authority of a guardian * * * does not extend beyond the jurisdiction of the Government under which he was invested with his authority."

■■ Defendant contends that the law of California should not be applied in this case by the Oregon court because the invalidity of the contract is a matter of remedy, rather than one of substance. Matters of remedy, procedure, are governed by the law of the forum. What is a matter of substance and what is a matter of procedure are sometimes difficult questions to decide. Stumberg states the distinction as follows: "* * * procedural rules should be classified as those which concern methods of presenting to a court the operative facts upon which legal relations depend; substantive rules, those which concern the legal effect of those facts after they have been established." Stumberg, Principles of Conflict of Laws (3d ed), 133. Based upon this conventional statement of the distinction, it is obvious that we are not concerned with a procedural issue, but with a matter of substantive law.

Plaintiff contends that the substantive issue of whether or not an obligation is valid and binding is governed by the law of the place of making, California. This court has repeatedly stated that the law of the place of contract "must govern as to the validity, interpretation, and construction of the contract." *Jamieson v. Potts*, 55 Or 292, 300, 105 P 93, 25 LRA (NS) 24 (1910). Restatement 408, Conflict of Laws, § 332, so announced and specifically stated that "capacity to make the contract" was to be determined by the law of the place of contract.

This principle, that *lex loci contractus* must govern, however, has been under heavy attack for years.

For example, see Lorenzen, *Validity and Effects of Contracts in the Conflict of Laws,* 30 Yale L J 565, 655 (1921), 31 Yale L J 53 (1921). The strongest criticism has been that the place of making frequently is completely fortuitous and that on occasion the state of making has no interest in the parties to the contract or in the performance of the contract. *Stumberg,* supra, at 231. The principle is undermined when it is observed that in many of the decisions, the state of the place of making had other associations with the contract, e.g., it was also the place of performance and the domicile of one of the parties. In our decisions stating this principle, the state whose law was applied had connections with the contract in addition to being the place of making. *Jamieson v. Potts,* supra (55 Or 292); *McGirl v. Brewer,* 132 Or 422, 443, 280 P 508, 285 P 208 (1930). As a result of this long and powerful assault, the principle is no longer a cornerstone of the law of conflicts. Tentative Draft No. 6, p 3, Restatement (Second), Conflict of Laws, comments on the new contracts chapter: "First, it no longer says dogmatically that the validity of a contract is governed by the law of the place of contracting."

There is no need to decide that our previous statements that the law of the place of contract governs were in error. Our purpose is to state that this portion of our decision is not founded upon that principle because of our doubt that it is correct if the *only* connection of the state whose law would govern is that it was the place of making.

In this case California had more connection with the transaction than being merely the place where the contract was executed. The defendant went to San Francisco to ask the plaintiff, a California resident,

for money for the defendant's venture. The money was loaned to defendant in San Francisco, and by the terms of the note, it was to be repaid to plaintiff in San Francisco.

On these facts, apart from *lex loci contractus,* other accepted principles of conflict of laws lead to the conclusion that the law of California should be applied. *Sterrett v. Stoddard Lbr. Co.,* 150 Or 491, 504, 46 P2d 1023 (1935), rests, at least in part, on the proposition that the validity of a note is determined by the law of the place of payment. Tentative Draft No. 6, p 30, Restatement (Second), Conflict of Laws, § 332b(a) states: "if the place of contracting and the place of performance are in the same state, the local law of this state determines the validity of the contract, * * *." Judge Goodrich in *Frankel v. Johns-Manville Corporation,* 257 F2d 508, 511 (3d Cir 1958), stated: "This throws both making and performance into the same state. And under those circumstances the conflict of laws rule in Pennsylvania is that the law of making-performance controls." The place of payment, unlike the place of making, is usually not determined fortuitously. The place is usually selected by the payee and the payee normally selects his place of business or the location of his bank. The parties at the time of contract normally do not have in mind the problem of what law should govern. If they did, it is our belief that the payee would intend the law of the place of payment to be governing.

There is another conflict principle calling for the application of California law. Stumberg terms it the application of the law which upholds the contract. *Stumberg,* supra, at 237. Ehrenzweig calls it the "Rule of Validation." Ehrenzweig, Conflict of Laws, 353

(1962). Mr. Justice Harlan, speaking for the majority in *Kossick v. United Fruit Co.,* 365 US 731, 741, 81 S Ct 886, 6 L ed2d 56 (1961), stated such a rule and cited Ehrenzweig. *Accord,* Leflar, *The Validity of Contracts and the Conflict of Laws,* 2 Ark L Bull 3 (1930). The "rule" is that, if the contract is valid under the law of any jurisdiction having significant connection with the contract, i.e., place of making, place of performance, etc., the law of that jurisdiction validating the contract will be applied. This would also agree with the intention of the parties, if they had had any intentions in this regard. They must have intended their agreement to be valid.

*Stumberg,* supra, at 237, observes that this principle has been most frequently applied in cases in which the claim of invalidity has been based upon the contention that the contract is usurious. The same principle, however, has been applied to other types of cases. The "rule of validation" is appealing because it is founded upon the same reasoning that is followed in other aspects of the law of contracts. This court and all other courts reiterate that contracts are "sacred and shall be enforced by the courts of justice unless some other over-powering rule of public policy intervenes which renders such agreement illegal or unenforceable.  *  *  *  Without such a rule the commerce of the world would soon lapse into a chaotic state." *Bliss v. Southern Pacific Co.,* 212 Or 634, 646, 321 P2d 324 (1958). This court has repeatedly stated that a contract is presumed valid. *Edwards Farms v. Smith Canning Co.,* 197 Or 57, 62, 251 P2d 133 (1952). We also consistently hold: "It is our duty to construe the writing, if possible, so that it has meaning and validity." *Champion v. Hammer,* 178 Or 595, 601, 169 P2d 119 (1946). In the general law of contracts

we constantly strive to hold the contract valid and enforceable. The "rule of validation" has the same purpose in conflict of laws.

Thus far all signs have pointed to applying the law of California and holding the contract enforceable. There is, however, an obstacle to cross before this end can be logically reached. In *Olshen v. Kaufman,* supra, we decided that the law of Oregon, at least as applied to persons domiciled in Oregon contracting in Oregon for performance in Oregon, is that spend-thrifts' contracts are voidable. Are the choice-of-law principles of conflict of laws so superior that they overcome this principle of Oregon law?

■ To answer this question we must determine, upon some basis, whether the interests of Oregon are so basic and important that we should not apply California law despite its several intimate connections with the transaction. The traditional method used by this court and most others is framed in the terminology of "public policy." The court decides whether or not the public policy of the forum is so strong that the law of the forum must prevail although another juris-diction, with different laws, has more and closer con-tacts with the transaction. Included in "public policy" we must consider the economic and social interests of Oregon. When these factors are included in a con-sideration of whether the law of the forum should be applied this traditional approach is very similar to that advocated by many legal scholars. This latter theory is "that choice-of-law rules should rationally advance the policies or interests of the several states (or of the nations in the world community)." Hill, *Governmental Interest and the Conflict of Laws—A Reply to Professor Currie,* 27 Chi L Rev 463, 474 (1960); Currie, *Selected Essays on the Conflict of*

*Laws,* 64-72 (1963), reprint from 58 Col L Rev 964 (1958).

■ The traditional test this court and many others have used in determining whether the public policy of the forum prevents the application of otherwise applicable conflict of laws principles is stated in the oft-quoted opinion of Mr. Justice Cardozo in *Loucks v. Standard Oil Co. of N. Y.,* 224 NY 99, 120 NE 198 (1918). Foreign law will not be applied if it "* * * would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." Quoted in *Schultz v. First Nat. Bk. of Portland,* 220 Or 350, 360, 348 P2d 22, 81 ALR2d 1121 (1960). In the latter case we held the law of Oregon—that contracts to adopt were invalid—was not so fundamental to our jurisprudence that we could not apply the Nebraska law— that such contracts were valid when made and to be performed in Nebraska. In that case the plaintiff, whose domicile is not stated, was claiming to be the heir, by reason of the Nebraska contract to adopt, of an Oregon decedent.

In *McGirl v. Brewer,* supra (132 Or 422), Oregonians purchased Montana land, delivering a promissory note secured by a purchase money mortgage. The note was executed, delivered, and payable in Montana. The purchaser defaulted and the mortgage was foreclosed in Montana. The foreclosure sale yielded less than the amount owing on the note and mortgage. The action in Oregon was on the note for the unpaid balance, i.e., for the deficiency. An Oregon statute prohibits a deficiency judgment in a foreclosure of a purchase money mortgage; a Montana statute permits such a deficiency judgment. The court pointed out that the Oregon statute was adopted to prevent a

repetition of the plight in which debtors found themselves in the panic of 1897. Nevertheless, this court found that the Montana statute is not a law "which offends by shocking moral standards, or is injurious or pernicious to the public welfare," applied the law of Montana, and permitted the action for the deficiency.[1]  (132 Or at 447)

In *Bowles v. Barde Steel Co.,* 177 Or 421, 433-437, 164 P2d 692 (1945), 162 ALR 328. Mr. Justice BRAND reviewed the subject and some of the leading cases and concluded: "The cases cited above do not involve penalties but they do manifest an evolution toward wider recognition by one state of the rights created by the statutes of another state."

How "deep rooted [the] tradition of the common weal," particularly regarding spendthrifts, is illustrated by our decisions on foreign marriages. This court has decided that Oregon's policy voiding spendthrifts' contracts is not so strong as to void an Oregon spendthrift's marriage contract made in Washington. *Sturgis v. Sturgis,* 51 Or 10, 93 P 696, 131 AS 724, 15 LRA (NS) 1034 (1908), was a suit for divorce and alimony. Defendant had been declared a spendthrift by an Oregon court. The guardian refused to consent to the spendthrift's marriage. The spendthrift got married in Washington. The marriage was held valid. Although the case involved a spendthrift's contract and, therefore, is persuasive in this case, it should not be considered determinative since marriage contracts are unique and the law applicable to marriage contracts does not necessarily apply to other types of contracts.

---

[1] Currie criticizes this case. Currie, *Selected Essays on the Conflict of Laws,* 421 (1963), reprint from 1960 Duke L J 1.

On the other hand, we have held a foreign marriage, made before the expiration of six months from the rendition of an Oregon divorce decree, is absolutely void in the courts of Oregon. *McLennan v. McLennan,* 31 Or 480, 50 P 802, 38 LRA 863 (1897). Our statute provided then, and provides now, that a divorced person is incapable of contracting marriage until six months from the expiration of the Oregon decree. ORS 107.110. *McLennan v. McLennan,* supra, did not use the reasoning that Oregon's public policy against too-early remarriage was so basic that a Washington marriage in violation thereof would not be recognized. However, in *In re Estate of Ott,* 193 Or 262, 269, 238 P2d 269 (1951), affirming *McLennan v. McLennan,* we did use the public policy rationale.

The only decision on this issue involving spendthrifts and economic contracts is *Gates v. Bingham,* 49 Conn 275 (1881). The defendant was adjudged a spendthrift in Connecticut. He moved to Massachusetts and there incurred a debt which was a valid debt in Massachusetts. An action was brought on the debt in Connecticut, and the defense of being a spendthrift was made. The defendant contended it was against the public policy of Connecticut to permit contracts with spendthrifts to be enforced. The court in its decision did not discuss this contention; it held that a contract valid where made is equally valid in Connecticut. Although the debt was for a necessity, rent, the court did not rest its decision on that fact.

The difficulty in deciding what is the fundamental law forming a cornerstone of the forum's jurisprudence and what is not such fundamental law, thus allowing it to give way to foreign law, is caused by the lack of any even remotely objective standards. Former limitations on the capacity of married women to con-

tract illustrate the difficulty. *Milliken v. Pratt,* 125 Mass 374, 28 AR 241 (1878), is used in many case books as an example. There, the Massachusetts court held that the Massachusetts law that a Massachusetts married woman was incapable of contracting as a surety was not such a cornerstone of Massachusetts jurisprudence and economy that Maine law to the contrary could not be applicable. However, in *Union Trust Co. v. Grosman,* 245 US 412, 38 S Ct 147, 62 L ed 368 (1918), Mr. Justice Holmes, writing for the court, held that a similar Texas limitation on a Texas married woman was such an integral part of Texas policy that the Illinois law to the contrary would not be enforced in a Texas court.

However, as previously stated, if we include in our search for the public policy of the forum a consideration of the various interests that the forum has in this litigation, we are guided by more definite criteria. In addition to the interests of the forum, we should consider the interests of the other jurisdictions which have some connection with the transaction.

Some of the interests of Oregon in this litigation are set forth in *Olshen v. Kaufman,* supra. The spendthrift's family which is to be protected by the establishment of the guardianship is presumably an Oregon family. The public authority which may be charged with the expense of supporting the spendthrift or his family, if he is permitted to go unrestrained upon his wasteful way, will probably be an Oregon public authority. These, obviously, are interests of some substance.

Oregon has other interests and policies regarding this matter which were not necessary to discuss in *Olshen.* As previously stated, Oregon, as well as all other states, has a strong policy favoring the validity

and enforceability of contracts. This policy applies whether the contract is made and to be performed in Oregon or elsewhere.

The defendant's conduct,—borrowing money with the belief that the repayment of such loan could be avoided—is a species of fraud. Oregon and all other states have a strong policy of protecting innocent persons from fraud. "The law * * * is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked." *Johnson v. Cofer*, 204 Or 142, 150, 281 P2d 981 (1955).

It is in Oregon's commercial interest to encourage citizens of other states to conduct business with Oregonians. If Oregonians acquire a reputation for not honoring their agreements, commercial intercourse with Oregonians will be discouraged. If there are Oregon laws, somewhat unique to Oregon, which permit an Oregonian to escape his otherwise binding obligations, persons may well avoid commercial dealings with Oregonians.

■ The substance of these commercial considerations, however, is deflated by the recollection that the Oregon Legislature has determined, despite the weight of these considerations, that a spendthrift's contracts are voidable.

California's most direct interest in this transaction is having its citizen creditor paid. As previously noted, California's policy is that any creditor, in California or otherwise, should be paid even though the debtor is a spendthrift. California probably has another, although more intangible, interest involved. It is presumably to every state's benefit to have the reputation of being a jurisdiction in which contracts can be made and performance be promised with the certain knowledge that such contracts will be enforced.

Both of these interests, particularly the former, are also of substance.

We have, then, two jurisdictions, each with several close connections with the transaction, and each with a substantial interest, which will be served or thwarted, depending upon which law is applied. The interests of neither jurisdiction are clearly more important than those of the other. We are of the opinion that in such a case the public policy of Oregon should prevail and the law of Oregon should be applied; we should apply that choice-of-law rule which will "advance the policies or interests of" Oregon. *Hill,* supra, 27 Chi L Rev at 474.

Courts are instruments of state policy. The Oregon Legislature has adopted a policy to avoid possible hardship to an Oregon family of a spendthrift and to avoid possible expenditure of Oregon public funds which might occur if the spendthrift is required to pay his obligations. In litigation Oregon courts are the appropriate instrument to enforce this policy. The mechanical application of choice-of-law rules would be the only apparent reason for an Oregon court advancing the interests of California over the equally valid interests of Oregon. The present principles of conflict of laws are not favorable to such mechanical application.

We hold that the spendthrift law of Oregon is applicable and the plaintiff cannot recover.

Judgment affirmed.

O'CONNELL, J., specially concurring.

In my dissent in *Olshen v. Kaufman,* 235 Or 423, 385 P2d 161 (1963) I expressed the view that ORS 126.335 should be construed to permit a creditor to

recover from a spendthrift under the circumstances of that case. A majority of the court felt otherwise.

Although I disagree with the rationale in that case, I must now accept it to the extent that it is applicable. I believe that it is applicable in the case before us and that its application forces us to choose the law of Oregon in preference to the law of California.

In the *Olshen* case we had to choose between two competing policies; on one hand the policy of protecting the interest of persons dealing with spendthrifts which, broadly, may be described as the interest in the security of transactions, and on the other hand the policy of protecting the interests of the spendthrift, his family and the county. It was decided that the Oregon Legislature adopted the latter policy in preference to the former.

The case at bar involves the same choice even though the contract was made in California and it was to be performed there. The fact that California was the setting for the making and performance of the contract is of no significance except that it requires us to consider California's interest in protecting its own citizens. That interest is an interest in the security of commercial transactions and was before this court in the *Olshen* case. To distinguish the *Olshen* case it would be necessary to assume that although the legislature intended to protect the interest of the spendthrift, his family and the county when local creditors were harmed, the same protection was not intended where the transaction adversely affected foreign creditors. I see no basis for making that assumption. There is no reason to believe that our legislature intended to protect California creditors to a greater extent than our own.

GOODWIN, J., dissenting.

I am unable to agree with the conclusion of the majority.

"Public policy" as a basis for decision has an overtone of predestination which sometimes tends to limit analysis. See Paulsen and Sovern, *"Public Policy" in the Conflict of Laws,* 56 Colum L Rev 969, 988 (1956). In a situation in which the law of the forum differs from the law of the jurisdiction having the majority of contacts with the transaction, the invocation of "public policy" may also produce a result that is contrary to generally accepted principles. 56 Colum L Rev at 988.

In *Loucks v. Standard Oil Co.,* 224 NY 99, 120 NE 198 (1918), Mr. Justice Cardozo discussed the situation in which an action's contacts with the forum state are so important that foreign law should not be applied. He pointed out that foreign law would not be applied if it "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." 224 NY at 111, 120 NE at 202.

In the instant case, the majority finds in effect that to apply the law of California would be to violate some deep-rooted tradition of our common weal. On the facts of this case, I believe the mere assertion of such a proposition suffices to refute it.

As a general rule the power conferred by a statute providing for the guardianship of a spendthrift's property is an extraordinary one, and should be exercised with great caution. See *Guardianship of Reed,* 173 Wis 628, 182 NW 329, 17 ALR 1063 (1921). I am aware of no compelling public reason for saving spendthrifts from the result of their folly at the expense of innocent merchants.

The case of *Gates v. Bingham,* 49 Conn 275 (1881), involved a spendthrift statute. The defendant had been declared a spendthrift in Connecticut, and a conservator had been appointed. The defendant moved to Massachusetts and failed to pay the rent for his house in Massachusetts. The plaintiff knew that the defendant was under a conservatorship in Connecticut. The defendant returned to Connecticut and continued to live in that state until the time of the action. The plaintiff brought the action in Connecticut. The court found that while the defendant was residing in Massachusetts he was *sui juris,* and "if incapable of managing his own affairs the only mode of securing a legal supervision for him was by proceeding under the laws of that state in the same manner as in the case of any other of its inhabitants * * *." 49 Conn at 278. The court also stated:

> "* * * The disability under which one is placed, with regard to his power to make contracts, by having a conservator appointed over him, is created wholly by statute, and can have no operation where the statute does not operate. It is a well settled principle that no statute can operate beyond the territorial limits of the state in which it was enacted * * *." 49 Conn at 278.

Because the facts in the *Bingham* case are so different from the facts in the instant case, I allude to the *Bingham* case only to illustrate one way in which a court has refrained from giving a spendthrift statute extraterritorial effect.

The majority opinion acknowledges that at common law a spendthrift was not considered incapable of contracting. The majority also points out that "[t]his court has decided that Oregon's policy voiding spendthrifts' contracts is not so strong as to void an Oregon

spendthrift's marriage contract made in Washington." These two statements suggest that the protection of Oregon spendthrifts is not "some deep-rooted tradition of the common weal." Furthermore, in the instant case, no "fundamental principle of justice" or "prevalent conception of good morals" would be violated if the law of California were applied.

The plaintiff was a merchant in California who was approached in the ordinary course of business by a seemingly competent person and asked to enter into a business arrangement. The notes were executed, delivered, and made payable in California. If the parties gave any thought to law at all, which is unlikely, they would have assumed that California law would apply to their business. Consequently, if California law were to be applied, it would neither surprise the parties nor shock the conscience of the court. It would hardly violate any "fundamental principle of justice" or "prevalent conception of good morals."

Because the majority opinion has presented a thorough outline of the different choice-of-law doctrines applicable to contract cases, I shall discuss only those doctrines that I think should be determinative in the instant case.

In *Principles of Conflict of Laws* (3d ed, 1963), Prof. George Wilfred Stumberg argues that the law which upholds the contract should determine the outcome of a choice-of-law problem in a contract case. He states:

"* * * It would seem to be more desirable to uphold the contract if it satisfies the law of any place with which it has a substantial connection, unless performance at the place of performance is prohibited * * *." Stumberg, supra at 238.

While discussing the principle of the law that upholds the contract, Stumberg points out that whatever theory of choice of laws is adopted, there is a danger that "public policy" may be argued against the foreign law. Stumberg states his view of the "public policy" argument in the following words:

"\* \* \* Policy as a ground for refusal of relief, it is believed, should be confined within narrow limits. As between the states, it should seldom, if at all, apply \* \* \*." Stumberg, supra at 239, footnote 59.

For the contrary view, see Currie and Schreter, *Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities,* 69 Yale L J 1323 (1960).

In *Contracts in the Conflict of Laws, Part One: Validity,* 59 Colum L Rev 973 (1959), Professor Albert A. Ehrenzweig also favors the rule that would uphold the contract, and points out:

"\* \* \* To be sure, courts have since been forced, while seeking common sense solutions, to pay lip service to the rigid formulas of official doctrine \* \* \*, but they have in effect continued to apply the *lex validitatis,* namely that law among the 'proper' laws under which the contract could be held valid in accordance with the parties' presumed intention \* \* \*." 59 Colum L Rev at 992.

See also Ehrenzweig, *The Conflict of Laws* (1962) at page 353; *Kossick v. United Fruit Co.,* 365 US 731, 81 S Ct 886, 6 L Ed2d 56 (1961); and *Pritchard v. Norton,* 106 US 124, 1 S Ct 102, 27 L Ed 104 (1882).

The transaction in the case at bar has adequate contacts with the state of California to make California law appropriate, and the law of California would uphold the validity of the contract. The pre-

sumed intentions of the parties would be carried out if the contract were enforced.

In recent years a number of courts have adopted the "center of gravity" or "points of contact" approach to solve problems concerning contracts and the conflict of laws. Stumberg, supra, at 240. These courts rely on the law of the place which has the most significant contacts with the matter in dispute. *Auten v. Auten*, 308 NY 155, 161, 124 NE2d 99, 50 ALR2d 246 (1954). The merit of the center-of-gravity approach is that the place having the most interest in the problem is given control over the legal issues arising out of the factual situation. *Auten v. Auten,* supra at 161. One difficulty with this approach is that it is somewhat wanting in predictability because of the subjective evaluations that may enter into the finding of the "center of gravity." See Currie and Schreter, supra at 1328.

The tentative draft of the Restatement (Second) adopts the center-of-gravity theory to determine the validity of contracts:

> "(1) The validity of a contract is determined by the local law of the state with which the contract has its most significant relationship, except in the case of usury (see § 334d)." Restatement (Second), Conflict of Laws § 332 (Tent. Draft No. 6, 1960) at 6.

The proposed draft also sets out guidelines to determine, in particular instances, the state "with which the contract has its most significant relationship." The draft adopts the following language:

> "(a) if the place of contracting and the place of performance are in the same state, the local law of this state determines the validity of the contract, except in the case of usury (see § 334d)

and as stated in §§ 346e to 346n * * *." Restatement (Second), Conflict of Laws § 332b (Tent. Draft No. 6, 1960) at 30.

In *Jansson v. Swedish American Line,* 185 F2d 212, 30 ALR2d 1385 (1st Cir, 1950), the United States Court of Appeals discussed the application of the center-of-gravity theory in contract cases. The court stated:

> "* * * But at least where the contract contains no explicit provision that it is to be governed by some particular law, what the courts applying this intention test actually seem to do is to examine all the points of contact which the transaction has with the two or more jurisdictions involved, with a view to determine the 'center of gravity' of the contract, or of that aspect of the contract immediately before the court; and when they have identified the jurisdiction with which the matter at hand is predominantly or most intimately concerned, they conclude that this is the proper law of the contract which the parties presumably had in view at the time of contracting * * *." 185 F2d at 218-219.

See also *Kievit v. Loyal Protect. Life Ins. Co.,* 34 NJ 475, 492, 170 A2d 22, 32 (1961) ; *Boston Law Book v. Hathorn,* 119 Vt 416, 423-424, 127 A2d 120, 125 (1956); Note, 17 Vand L Rev 283, esp. footnote 18 at page 286.

On the basis of the general theory adopted by the Restatement (Second), supra, the guidelines presented in the Restatement, and the method of application of the center-of-gravity principle outlined in the *Jansson* case, the law of California would be the law applicable if the trial of the instant case were being held in a neutral state. The majority opinion virtually concedes that both the rule of validation and the center-of-

gravity theory point to the application of California law. The majority says, however, that these established principles of conflict of laws should give way to the "public policy" of Oregon.

The case of *Haag v. Barnes,* 9 NY2d 554, 175 NE2d 441, 87 ALR2d 1301 (1961), illustrates the way in which the Court of Appeals of New York dealt with a somewhat similar situation. Although the facts in the *Haag* case were unlike those in the instant case, the reasoning of the court is instructive. In the *Haag* case, a legal secretary who lived in New York worked for an Illinois lawyer whenever he came to New York on business. The secretary alleged that during the course of this relationship they became intimate and she became pregnant by the defendant. She went to Illinois to have her child, and the parties entered into an agreement in Illinois whereby the defendant agreed to pay $275 per month to the plaintiff until the child reached the age of sixteen. The parties stipulated that the laws of Illinois were to govern the validity of the contract. Under the law of Illinois the agreement was valid.

The plaintiff contended later that the agreement was unenforceable because it did not receive court approval as required by New York statute. The court held that she was bound by it, notwithstanding the failure of the agreement to meet the requirements of the New York statute. While contrary to a local statute, the agreement did not offend the public policy of New York. See 16 Okla L Rev 427, 430 (1963).

In *Bernkrant v. Fowler,* 55 Cal2d 588, 360 P2d 906 (1961), the court weighed the various considerations involved in making a choice of law and enforced an oral agreement made in Nevada against the con-

tention that it was unenforceable under the California statute of frauds. The opinion, by Traynor, J., carefully considered the precedents, and concluded that by enforcing the agreement as the parties made it, the common policy of both states in favor of enforcing contracts should prevail in the face of the local statute which made unenforceable certain oral contracts when made in California.

In both the *Haag* case and the *Fowler* case, local statutes announced a "public policy." In each case, however, the local court recognized the validity of considerations that were of greater legal importance than the local policy. In each case the contract in question had substantial relationships with a state other than that of the forum. These relationships created interests deserving of protection.

In the case before us, I believe that the policy of both states, Oregon and California, in favor of enforcing contracts, has been lost sight of in favor of a questionable policy in Oregon which gives special privileges to the rare spendthrift for whom a guardian has been appointed.

The majority view in the case at bar strikes me as a step backward toward the balkanization of the law of contracts. *Olshen v. Kaufman,* 235 Or 423, 385 P2d 161 (1963), held that there was a policy in this state to help keep spendthrifts out of the almshouse. I can see nothing, however, in Oregon's policy toward spendthrifts that warrants its extension to permit the taking of captives from other states down the road to insolvency.

I would enforce the contract.

SLOAN, J., joins in this dissent.