**Dorothy V. SUMMERS, individually and as Executrix of the Estate of John M. Summers, Deceased, et al., Plaintiffs-Appellees.**

v.

**INTERSTATE TRACTOR AND EQUIPMENT CO., a corporation, Defendant-Appellant,**
**and**
**General Motors Corporation, a corporation, Defendant.**

**No. 25740.**

United States Court of Appeals, Ninth Circuit.

Aug. 18, 1972.

Trask, Circuit Judge, filed a dissenting opinion.

George M. Joseph (argued), of Bemis, Breathouwer & Joseph, Portland, Or., for defendant-appellant.

Raymond J. Conboy (argued), John Haugh, Richard Noble, of Pozzi, Wilson & Atchison, Portland, Or., for plaintiffs-appellees.

Before DUNIWAY and TRASK, Circuit Judges, and FERGUSON,* District Judge.

FERGUSON, District Judge:

This appeal is from a jury verdict in a diversity action. We affirm.

The action was filed against Interstate Tractor and Equipment Company (Interstate) and General Motors Corporation (General Motors) for the wrongful death of the deceased. The action was tried on the theory of strict liability. The verdict was against Interstate only, and it has appealed.

The appeal involves three issues:

(A) The sufficiency of the evidence to permit the issue of liability to go to the jury.

(B) The refusal of the district court to apply the Oregon $25,000 limitation on wrongful death recoveries.

(C) The capacity of the plaintiff to sue in Oregon.

*Sufficiency of the Evidence*

Plaintiffs are the widow-executrix and the children of John Summers, who was killed when a dump truck which he was driving failed to negotiate a turn and went over an embankment into the Columbia River at a construction project in the State of Washington. The dump truck was leased to the deceased's employer, a construction company, by Interstate. The case was tried on the theory of strict liability by reason of an allegedly unreasonably dangerous and defective condition of the steering mechanism of the truck.

A summary of the evidence in the light most favorable to the plaintiff, Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196 (9th Cir. 1963), is as follows:

(1) The decedent had been employed as a truck driver in the construction industry for some sixteen years and was an excellent driver. He enjoyed good health and had no history of heart or respiratory diseases.

(2) At the time of the accident, decedent was delivering fill for the build-up of a cofferdam. He was working on the Washington side of the river, and had been driving along the same route for the preceding six weeks. His routine, repeated continuously, was to load his truck at the company's fill pile, drive down the cofferdam road, dump the fill, and return. Each trip would take some 12 to 15 minutes. He had driven the

---

\* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

route from 800 to 1,000 times prior to the accident without incident.

(3) The dump truck had been leased by decedent's employer from Interstate some 15 days prior to the accident. During that time it saw only limited service. It was used only as a "spare" from the outset, because of poor steering. As a spare, it would only be operated when another truck was being overhauled or oiled. It was operated only between the fill pile and the cofferdam, a distance of about one-fourth mile.

(4) Except for a minor valve adjustment, there was no evidence that the truck had been altered, repaired, abused or involved in an accident during its limited service at the dam site.

(5) The dirt road from the fill pile to the cofferdam had a gradual curve with a slight downhill slope which was easily negotiable.

(6) On the evening of the accident, the dump truck had been briefly operated by one of decedent's fellow drivers, McKissen, while his regular vehicle was being repaired. At about 7:30 p. m. (the accident occurred at 11:00 p. m.) McKissen noticed that the truck's steering became faulty. He found it necessary to race the engine to increase pressure to the steering. However, even with the "revving," McKissen found he could not turn adequately. He drove the truck to the employer's maintenance shop, where the foreman checked the truck's power steering pressure and found it to be low. The model truck in question needed 1100 to 1150 psi for adequate steering, but the pressure in this truck had dropped to 800 psi. The foreman adjusted a valve in the steering booster system to raise the pressure to 1200 psi.

(7) After the pressure was boosted, the truck was put back into service as a standby and later in the evening was driven by Patterson, whose regular truck was being oiled. Patterson drove the truck for roughly an hour. He noted that the steering was not as good as his own vehicle's. While driving this ve-

hicle, Patterson met Summers on the cofferdam road. Summers had brought Patterson's regular truck out from the shop, after leaving his truck there for a checkup. Summers and Patterson switched trucks, with Patterson taking his regular vehicle and Summers operating the truck in question.

(8) The accident occurred about thirty minutes later. As decedent was driving along the cofferdam road and beginning to negotiate the gradual curve on that roadway, the truck, which was fully loaded, left the roadway and plunged into some 30 to 40 feet of water. Just prior to leaving the roadway, the truck was "revved up" high. McKissen characterized what he heard as the highest rpms he had ever experienced. The significance of this "revving" is that when experiencing inadequate steering in general, and with the vehicle in question in particular, it was imperative for the driver to "rev" the engine to increase steering ability.

(9) Decedent's body was recovered from the cab by a diver some two hours after the accident. The cause of death was asphyxia due to drowning.

(10) When the vehicle was recovered two months later, it was taken to Interstate's maintenance shop in Oregon without notification to the Washington authorities. While the truck was in Interstate's shop, some 28 parts of the steering assembly were replaced, including a piston rod connected to the steering assembly, a steering valve, a steering pump and gears in the steering pump. The piston rod was found to have been bent. The parts replaced were later destroyed. Had the piston rod, steering valve or steering pump been defective prior to the accident, these defects could have affected the steering and the ability of the driver to control the truck.

(11) Talbott, plaintiffs' consulting engineer, and Kerns, a mechanic retained by the Washington authorities, examined the truck in question some 20 months after the accident. Both found

during their inspections that the spline and shaft of the steering mechanism were in poor condition, allowing slippage in the steering, and further found loose fittings over the end of the input shaft. Kerns, who had a great deal of experience working on the truck model in question, testified that this particular model had a history of steering difficulty and that he had often repaired the steering mechanism. He concluded that the design of the yoke and spline parts was inferior and led to serious steering problems.

(12) It would be virtually impossible to steer the truck when fully loaded if its power steering became inoperative or seriously impaired.

■ The issue is whether there was sufficient evidence for the jury to conclude that the truck became uncontrollable in normal operation due to a defect in the steering mechanism. In determining that there was, the trial court applied the law of Oregon. No conflict of laws problem is presented, for the parties agree that Oregon and Washington both have adopted Section 402 A [1] of the Restatement (Second) of Torts, the controlling substantive law on the issue of liability.

The Oregon law on the issue of proof in products liability cases is clearly set forth in Heaton v. Ford Motor Co., 248 Or. 467, 435 P.2d 806 (1967):

"In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user. When it is shown that a product failed to meet the reasonable expectations of the user the inference is that there was some sort of defect, a precise definition of which is unnecessary. If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect." 435 P.2d at 808.

This rule was reaffirmed in Brownell v. White Motor Corp., 490 P.2d 184 (Or.1971):

"When the jury reasonably can find that the product is unchanged from the condition it was in when sold and the unusual behavior of the product is not due to any conduct on the part of the plaintiff or anyone else who has a connection with the product, logic dictates that it is a distinct possibility that there is some defect in the product." 490 P.2d at 187.

*See also,* Vanek v. Kirby, 253 Or. 494, 450 P.2d 778 (1969).

In the instant case, plaintiff satisfied the requirements of Oregon law. She produced evidence from which the jury could logically conclude that the steering in this dump truck was deficient or completely inoperative at the time of the accident, that the accident was caused by such defective steering and not by dece-

---

1. "§ 402 A. *Special Liability of Seller of Product for Physical Harm to User or Consumer*

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

dent, and that the defects in the steering were present at the time the vehicle was leased by Interstate to decedent's employer. To be sure, plaintiff was not able to produce any direct evidence of a defect. This is not necessary under Oregon law.

While the jury could have drawn other inferences from the evidence, the fact remains that plaintiff's evidence was not devoid of probative value and a jury could rationally have reached the verdict based upon a fair appraisal of the evidence. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946). Accordingly, the lower court did not err in overruling Interstate's motions for a directed verdict.

### Limitation of Recovery

The jury returned a verdict of $75,000 in favor of the plaintiffs. At the time of the accident in question, Oregon's wrongful death statute had a maximum recovery limitation of $25,000. An act amending this statute to remove the maximum recovery limitation had been signed by the governor prior to the accident, but because of a waiting period required by the Oregon Constitution, that amendment did not become effective until September 13, 1967, several weeks after the accident. Washington had no statutory maximum recovery limitation. Interstate argues that the trial court erred in ruling that the Oregon conflict of laws rule required application of Washington law rather than that of Oregon.

■■ The federal court in a diversity action is obligated, under Erie R.R.

Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941), to apply the conflicts law of Oregon, the forum state.[2] Until a few years ago, Oregon had committed itself to the traditional conflicts rule, adopting the law of the place of wrong. See, e. g., Nadeau v. Power Plant Engineering Co., 216 Or. 12, 337 P.2d 313 (1959).

■ In 1967, however, the Oregon Supreme Court rejected the rigid application of the place of wrong rule in favor of the rule that the law of the state with the most significant contacts with the occurrences and with the parties would determine the rights and liabilities in the action. Casey v. Manson Construction & Engineering Co., 247 Or. 274, 428 P.2d 898 (1967); see also, Lilienthal v. Kaufman, 239 Or. 1, 395 P.2d 543 (1964). The court, in Casey, was guided by the most significant contacts rule of the Restatement (Second) of Conflict of Laws § 379 (Tent.Draft No. 9, 1964), which provides:

"(1) The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort.

"(2) Important contacts that the forum will consider in determining the state of most significant relationship include:

"(a) the place where the injury occurred,

"(b) the place where the conduct occurred,

2. This court owes some deference to the views of the district judge as to what the law of Oregon is. He is a former Oregon state judge. Bernhardt v. Polygraphic Company of America, Inc., 350 U.S. 198, 204–205, 76 S.Ct. 273, 100 L.Ed. 199 (1956); Huddleston v. Dwyer, 322 U.S. 232, 237, 64 S.Ct. 1015, 88 L.Ed. 1246 (1944); MacGregor v. State Mutual Life Assurance Co., 315 U.S. 280, 281, 62 S.Ct. 607, 86 L.Ed. 846 (1942);

State Farm Mutual Automobile Insurance Co. v. Murnion, 439 F.2d 945, 948 (9th Cir. 1971); Turnbull v. Bonkowski, 419 F.2d 104, 106 (9th Cir. 1969); Owens v. White, 380 F.2d 310, 315 (9th Cir. 1967); 1 Barron & Holtzoff (Wright ed.) § 8, at 41; 1A J. Moore, Federal Practice, ¶ 0.309 [2], at 3330 (2d ed. 1964); C. Wright, Law of Federal Courts, § 58, at 240 (1970).

"(c) the domicil, nationality, place of incorporation and place of business of the parties, and

"(d) the place where the relationship, if any, between the parties is centered.

"(3) In determining the relative importance of the contacts, the forum will consider the issues, the character of the tort, and the relevant purposes of the tort rules of the interested states."

Subsequently, in DeFoor v. Lematta, 249 Or. 116, 437 P.2d 107 (1968), a wrongful death action, the Oregon Supreme Court cited with approval Reich v. Purcell, 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967), which had adopted an analysis of governmental interests approach to conflict of laws problems. In *Purcell,* the court considered the relevant interests of the respective states in the transaction and in the parties and held that it would apply the law which most reasonably served the interests of the state having the more substantial interest to be served in the particular litigation.

Thus, Oregon has rejected the place of wrong rule in favor of a standard which combines elements of the most significant contacts approach with those of the governmental interests approach.

■ The facts from which the trial court determined that Oregon would apply Washington law on the damage limitation issue are: Interstate is incorporated in Oregon and has its principal place of business in Oregon; the dump truck in which decedent died was leased in Oregon to decedent's employer; the employer's offices were in Oregon, but its work frequently carried it into Washington; the accident occurred in Washington and decedent died in Washington; he had been working at the Washington construction site for several weeks; at the time of the accident, decedent and his family were domiciled in Oregon; subsequently, decedent's surviving wife and children became domiciled in Washington in order to be near relatives, and decedent's estate is being administered in that state.[3]

The two most important Oregon cases, from which this court must determine what law the courts of Oregon would apply in this situation, are *Casey, supra,* and *DeFoor, supra.* In *Casey,* a resident of Oregon was injured while employed by a Washington employer at a construction site in Washington. After examining the policies and interests of the respective states, the court applied the law of Washington, emphasizing that the Oregon resident was both working in Washington and was injured in Washington. Although the court adopted the most significant contacts rule, it attributed considerable importance to the fact that Washington was the place of wrong.

In *DeFoor,* both parties were Oregon residents. They had traveled from Oregon to California to pick up a helicopter and were en route from California back to Oregon when the helicopter crashed in California, killing DeFoor. The court applied Oregon law limiting damages, on the ground that the only real relationship California had to the cause of action was the fact that the accident occurred there. The court emphasized that the economic impact of the judgment would be felt primarily in Oregon,

---

3. The fact that the decedent's wife and children are now domiciled in Washington is not a fact that should carry weight in deciding which law applies. *See* Reich v. Purcell, 67 Cal.2d 551, 555, 63 Cal Rptr. 31, 34, 432 P.2d 727, 730 (1967), where Chief Justice Traynor said:
"Although plaintiffs now reside in California, their residence and domicile at the time of the accident are the relevant residence and domicile. At the time of the accident the plans to change the family domicile were not definite and fixed, and if the choice of law were made to turn on events happening after the accident, forum shopping would be encouraged. (See Cavers, op. cit., supra, p. 151, fn. 16.) Accordingly, plaintiffs' present domicile in California does not give this state any interest in applying its law. . . ."

and that the application of Oregon law was consistent with the reasonable expectations of both parties since they were both domiciled there.

In this case, the death of Summers and its cause both occurred in Washington. That is where the truck failed to function properly. The fact that the accident occurred there was not a mere fortuitous circumstance, since Summers' employer had been working at this Washington construction site for several months and decedent had been employed there for six weeks immediately prior to the accident.

These facts indicate that Washington State has a substantial interest in the application of its law in this case. We must next examine the contacts of Oregon and the interest of that state in the application of its law limiting recovery in wrongful death actions. The deceased was a resident of Oregon, the truck was leased in Oregon by an Oregon corporation, and plaintiffs were Oregon residents at the time of the accident. However, it is clear that at the date of the accident Oregon had no interest in the application of its law limiting damages. The amendment repealing that law had passed the legislature and had been signed by the governor prior to the accident. Thus, although the limitation was still technically in effect, the policies and interests supporting the limitation had been officially rejected and abandoned in favor of the amended legislation which permits full compensation to the accident victim.

Accordingly, we hold that the district court correctly determined that an Oregon court would have applied Washington law on the issue of quantum damages.

### Capacity to Sue

■■ Finally, Interstate argues that under the law of Oregon the plaintiff had no capacity to bring an action in the courts of Oregon and, therefore, had no capacity to bring a diversity action in the federal court. It asserts that the plaintiff's lack of capacity rendered the federal court without jurisdiction to hear this action. Although that argument is being raised for the first time on appeal, this court will consider the matter because it is claimed that it deals with the subject matter jurisdiction of the federal court and such an issue can be raised at any time. Rule 12(h)(3), Fed.R.Civ.P.

Plaintiff in this action is the executrix of the estate of John M. Summers, which is a Washington estate, and her sole authority to bring a wrongful death action derives from her status as executrix under the laws of the State of Washington. She was not qualified as a personal representative in Oregon.

Rule 17(b), Fed.R.Civ.P., provides that the capacity of an individual to sue or be sued "shall be determined by the law of the state in which the district court is held. . . ." Under the law of Oregon in effect at the time this action was commenced, plaintiff, as executrix of a foreign estate, lacked the capacity to bring this action in the courts of Oregon and, consequently, had no capacity to bring this diversity action in the District Court for the District of Oregon. See Pantano v. United Medical Laboratories, Inc., 456 F.2d 1248 (9th Cir. 1972), and cases cited therein.

Plaintiff asserts, however, that Interstate's challenge to her capacity to sue is untimely and the defense has been waived. We agree. In a diversity action the timeliness of the defense of a party's lack of capacity to sue or be sued is to be determined according to federal law. Rule 9 of the Federal Rules of Civil Procedure provides that the defense of lack of capacity to sue must be raised "by specific negative averment." Rule 12 provides that every defense must be raised in the responsive pleading or by motion before pleading. With the exception of a few specified defenses, any defense not so raised is deemed to have been waived. Since Interstate

did not raise the defense of plaintiff's capacity to sue by specific negative averment in its answer, or at any time until appeal, it is deemed to have waived that defense. Montellier v. United States, 202 F.Supp. 384 (E.D.N.Y. 1962).

■ Interstate attempts to avoid this conclusion by contending that the defense of lack of capacity to sue in a diversity action goes to the issue of the subject matter jurisdiction of the federal court and, pursuant to Rule 12(h) (3), Fed.R.Civ.P., can be raised at any time. We hold to the contrary. The question of a litigant's capacity or right to sue or to be sued generally does not affect the subject matter jurisdiction of the district court. The jurisdiction of the district court was and is based upon 28 U.S.C. § 1332(a)(1). The jurisdictional prerequisites of a diversity action have been satisfied completely. Plaintiff is the executrix of a Washington estate, and all plaintiffs in their individual capacities reside in Washington. Interstate is a corporation organized under the laws of Oregon and has its principal place of business in Oregon. The district court clearly had jurisdiction to hear the action. Since the defense of lack of capacity has no bearing in this action upon the jurisdiction of the federal court, that defense has been waived. Young v. Pattridge, 40 F.R.D. 376 (N.D.Miss.1966).

The judgment is affirmed.

TRASK, Circuit Judge (dissenting):

With deference to the majority and to the expertise of the trial judge as to Oregon law I disagree with both in applying Washington law to the question of limitation of liability. It would appear that DeFoor v. Lematta, 249 Or. 116, 437 P.2d 107 (1968), would control here.

The only arguably substantial Washington interest was the fact that the accident occurred there. The weight to be accorded to this circumstance is directly negated by the adoption in Oregon of the significant contacts choice of law rule. Casey v. Manson Construction & Engineering Co., 247 Or. 274, 428 P.2d 898 (1967). In doing so, as the majority points out, the Oregon Supreme Court rejected the "rigid application of the place of wrong rule" in favor of the significant contacts principle. It does not seem logical to suppose that when Washington removed its limitation of liability rule, it was doing so to favor Oregon residents. Here the employer was an Oregon employer, Interstate Tractor & Equipment Company, was an Oregon corporation with its principal place of business there and the deceased and his family were residents of Oregon. All of the economic impact (as the *DeFoor* court emphasized) would be felt in Oregon. Money damages and the amount thereof is an economic measure.

The majority points to the fact that the Oregon law limiting damages had been repealed at the date of the accident. Its remaining in effect, it is pointed out, was a technicality. Clearly the law in effect at the date of the accident is the law to be considered. In Oregon on that date there was a limitation of liability. It was not a technicality. It was the law of Oregon. I am of the opinion that Oregon in making its determination of the choice of law on limitation of liability would have followed its own decision in DeFoor v. Lematta, 249 Or. 116, 437 P.2d 107 (1968), and would so hold.