**TELEPHONE MANAGEMENT CORPORATION, Plaintiff,**

v.

**THE GOODYEAR TIRE & RUBBER COMPANY, Defendant.**

No. 5:98–CV–1097.

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 29, 1998.

William M. Oldham, Oldham & Dowling, Akron, Gary Lynn Roberts, Schwabe, Williamson & Wyatt, Portland, OR, Robert J. Yorio, James W. Lucey, Suzanne D. DiNubile, Carr & Ferrell, Palo Alto, CA, for plaintiff.

Paul A. Rose, John C. Fickes, Christopher Frederick Swing, Brouse & McDowell, Akron, Keven Drummond Eiber, Brouse & McDowell, Cleveland, OH, for defendant.

## OPINION AND ORDER

GWIN, District Judge.

On November 16, 1998, Defendant Goodyear Tire and Rubber Company ("Goodyear") filed a motion for summary judgment [Doc. 31]. For the reasons that follow, this Court grants Goodyear's motion for summary judgment.

This action arises from a written telephone service consulting contract between Plaintiff Telephone Management Corporation ("TMC") and Defendant Goodyear. Plaintiff TMC sues Goodyear for breach of contract, breach of an implied covenant of good faith and fair dealing, quantum meruit, misrepresentation, and misappropriation of trade secrets.

In its motion for summary judgment, Defendant Goodyear says it should receive judgment because Plaintiff TMC fails to show evidence that Defendant Goodyear breached its agreement with TMC. In claiming that Plaintiff TMC shows no evidence of breach of contract, Goodyear says the contract required written recommendations from Plaintiff TMC and written acceptance from Defendant Goodyear. Goodyear accepted no recommendation by TMC in writing. Defendant Goodyear also says that Plaintiff TMC is trying to recover compensation for nothing more than a suggestion that phone rates were falling, information then known by all in the telecommunication field.

Plaintiff TMC disagrees. It claims a right to a percentage of savings Defendant Goodyear realized after Goodyear negotiated lower phone rates from its telephone service provider, AT & T. In making a claim for a commission, Plaintiff TMC alleges Defendant Goodyear used trade information supplied to it by TMC to better negotiate a more favorable telephone service contract with AT & T.

TMC says this was a breach of Goodyear's contract with TMC and is a misappropriation of trade information.

In reviewing the instant motion for summary judgment, the Court decides whether material issues of fact exist to warrant consideration by a jury. In undertaking this review, the Court decides the following issues: (1) whether disputed facts remain regarding Plaintiff TMC's claims against Defendant Goodyear for breach of written contract and breach of an implied covenant of good faith and fair dealing; (2) whether Plaintiff gives sufficient facts to support its claims for *quantum meruit* or unjust enrichment; and (3) whether disputed facts remain regarding TMC's claim for misappropriation of trade secrets.

The Court also decides whether Plaintiff TMC provides sufficient facts to support its claim for intentional misrepresentation. Here, the Court also evaluates whether Plaintiff TMC shows evidence of fraud or intentional misrepresentation.

For the reasons that follow, the Court finds that the Court should give Defendant Goodyear judgment as to all claims made by Plaintiff TMC.

### I. Background of Dispute

#### A. The Contract Between TMC and Goodyear

Defendant Goodyear manufactures and sells tires and rubber-related products. To this end, Goodyear operates dozens of facilities and thousands of retail stores throughout the world, employing more than 90,000 persons. To succeed, Goodyear needs an effective means of communicating data and direction within the organization and with others.

Goodyear uses a Corporate Telecommunications Department to coordinate its voice and data communications. During relevant times, Earl Jobe managed the department. Jobe reported to Goodyear's assistant comptroller, Joseph Gilchrist.

Plaintiff TMC helps large telephone users, typically large corporations, in identifying cost savings in communication expenditures. Plaintiff TMC usually accomplished this by

identifying improper taxes or "feature group" errors. Feature group errors involve charging a customer more than the rate charged by an inter-exchange carrier to place a call within a toll area. At relevant times, Plaintiff TMC was a small organization, employing only five to ten employees.

Near 1992, Plaintiff TMC solicited work from Goodyear. In its solicitation, TMC proposed helping Goodyear review communication charges and recommending ways to lower future charges or obtain refunds or credits on past charges. After extended discussions, Goodyear entered a contract with Plaintiff TMC on June 18, 1992. Under the contract, Goodyear:

> ... authorizes Telephone Management Corporation to review telephone billings of Goodyear and to submit recommendations on how Goodyear may obtain, from telephone companies, the following:
>
> A. Savings on current and future billings
>
> B. Refunds or credits from past billings.[1]

The 1992 contract also stated that TMC needed prior written consent from Goodyear before Plaintiff TMC could do any work that could lead to a claim by TMC for compensation:

> ALL RECOMMENDATIONS OR CHANGES OF SERVICE OR FACILITIES ORIGINATING FROM TELEPHONE MANAGEMENT MUST HAVE GOODYEAR'S PRIOR WRITTEN APPROVAL BEFORE ANY IMPLEMENTATION CAN BE PERFORMED BY TELEPHONE MANAGEMENT[2]

The contract limited Plaintiff TMC's right to receive compensation for cost reductions not resulting from TMC recommendations. The contract said that TMC "shall not share in any savings, refunds or credits voluntarily applied to [Goodyear's] telephone billings by telephone companies, that were not as a result of [TMC's] recommendations or supplied written information."

Under the contract, TMC reviewed Goodyear's telephone billings and made written recommendations to cut costs. Goodyear agreed to pay Plaintiff TMC each month 33%

of the verifiable savings resulting from the use of a written recommendation that Goodyear had accepted in writing. This payment schedule was to last 36 months after the date Goodyear carried out the written recommendation. Goodyear also agreed to pay to TMC amounts representing 50% of those refunds or credits Goodyear received because of TMC's recommendations.

Under the contract, Goodyear gave TMC a right to audit Goodyear's telephone billings and records. Goodyear gave Plaintiff TMC this right to learn what cost-savings resulted from TMC's written recommendations.

Joseph Gilchrist, Goodyear's Assistant Controller, summarized the work Plaintiff TMC was to do under the contract:

> Q. All right. Well, let's ask you what you did hire Telephone Management Company for?
>
> A. It's right in the contract, I believe. It was to review documents, billing documents, to review billing documents from our telecommunications suppliers to determine if they were correct and accurate, and to help us in recovering any inaccuracies for which they would get a piece of the action.

Joseph Gilchrist deposition at 19.

## B. TMC's work under the 1992 contract

Under the June 18, 1992, contract, Plaintiff TMC made a total of eight written recommendations to Goodyear. Plaintiff TMC made seven of these recommendations in 1992. Of these 1992 recommendations, Goodyear accepted six and implemented one. The other five failed to realize savings. Excepting one, all of Plaintiff TMC's recommendations dealt with suggestions to reduce Goodyear's taxes.

Plaintiff TMC made these recommendations using a standard form. Under this procedure, Goodyear acknowledged receipt of the recommendation in writing, recorded on the form submitted by TMC. Plaintiff TMC has used this method of giving recommendations for twenty-four years.

---

**1.** Plaintiff's Exhibit 1.

**2.** *Id.* (emphasis in original).

As for the single recommendation that Goodyear carried out, Goodyear provided its telephone billings to TMC and received monthly invoices for TMC's share of the savings. Goodyear paid these invoices.

A former TMC employee, Richard Gillette, was responsible for reviewing Goodyear's billings and for making recommendations. In making his analysis, Gillette used publicly available FCC documents, state public utility documents, and federal, state, and municipal tax codes. The Goodyear savings, like that of most TMC customers, were found in taxes and feature groups. As described above, the feature groups were tariffs that permitted the user to pay no more than would be charged by an inter-exchange carrier for a call within a toll area.

### C. TMC's Analysis of Contract Tariff 552

In October 1993, Goodyear entered a comprehensive contract tariff with AT & T. Under this agreement, known as Contract Tariff Number 552 ("Tariff 552"), Goodyear agreed to use AT & T's software-defined network service for domestic and international telecommunications services under rates described in the contract. Tariff 552 also provided for 1–800 domestic and international service and international private line service. Tariff 552 had a term of four years and eight months for software-defined network service and three years for 1–800, international, and other services.

Within a year of signing the Tariff 552 contract, the telecommunications industry changed dramatically. First, local telephone companies changed the requirements for carrying out feature group services. Because feature group services were less available, Plaintiff TMC was less able to obtain savings for its customers by comparison with these rates. Because its customers received less

savings, TMC received less income from identifying these savings.

Second, the rates for long-distance telephone services fell dramatically. These rates fell due to improvements in technology and deregulation of the telecommunications industry, with an attendant increase in competition.

Because of these changes, Goodyear sought to reduce the price it was paying under the Tariff 552 contract.[3] Goodyear entered negotiations with AT & T to reopen its tariff. Goodyear also discussed rates with MCI and Sprint, AT & T's major competitors.

Plaintiff TMC sought to participate in Goodyear's negotiations with AT & T.[4] On October 19, 1994, TMC's Chief Executive Officer, Tom Morency, requested a phone conversation with Goodyear's Director of Communications, Joseph Gilchrist, and Assistant Controller, Earl Jobe. Gilchrist supervised Jobe and made decisions on telecommunication contracts, with Jobe's participation.[5] Gilchrist alone decided to hire TMC.[6]

Gilchrist described the purpose of the October 19, 1994, conversation with Morency:

Q. Now, I'm going to ask you again what is your understanding as to why this conference was set up and what you were going to talk about?

A. I believe that Tom Morency, who is the head of I guess TMC, wanted to talk to us about getting into the negotiations we already had underway with AT & T and others to lower our telecommunications costs.

---

**3.** It was not unusual for Goodyear to have ongoing negotiations with AT & T. Because Goodyear was such a large purchaser of services and had so many different requirements, Goodyear had long engaged in continual negotiations with AT & T over the charges it paid and the services it received.

**4.** Goodyear's Director of Telecommunications, Earl Jobe, testified:

Q. Why in 1994 were there specific discussions with Telephone Management Corporation to assist Goodyear in connection with dis-

cussions with AT & T and any renegotiations that were going to take place with AT & T?

\* \* \* \* \* \*

A. My understanding is it was only because TMC raised the issue.... TMC requested to do so.

Jobe deposition at 30–31.

**5.** Gilchrist directly supervised 250 Goodyear employees and 1,700 indirectly.

**6.** Joseph Gilchrist deposition at 20–22.

Q. All right. And were you looking to Telephone Management Corporation to assist you in that area?

A. We were not.

> * * * * * *

Q. And what did he [Morency] say, to your knowledge?

A. I don't really remember. He talked about a lot of things, how he could help us with AT & T and do this and do that and so on, and we said we didn't need that kind of help.

> * * * * * *

Q. So there was no discussion of savings whatsoever?

A. I think there was discussion that they could save us money but I must tell you everybody says that. You go buy a car tonight and your car salesman is going to save you money, that was routine.

> * * * * * *

Q. And were suggestions made in that meeting that the National account management or manager for AT & T be contacted to discuss whether additional savings could be utilized?

A. I don't remember that but I can tell you we had contacted him months before that.

Q. Were there any discussions about motivating AT & T to sweeten the deal that you were already working under and what could be done to accomplish that?

A. I think he tried to do that and we told him we had already done all of that.

Q. So is it your testimony that as a result of that conversation you instructed Telephone Management to do nothing further, that you didn't need their services in that area?

A. That's correct. They may have asked for some information that we may have agreed to give them but we told them we did not need any help....

> * * * * * *

Q. Are you saying that you made it clear to them as a result of that conversation that you didn't need their help in any negotiations?

A. I am absolutely saying that.

Gilchrist deposition at 39–42.

Former TMC employee Janis Hoyer also participated as a note taker in the telephone conference. Hoyer testifies:

> The manner in which Tom Morency initiated and handled the October 19 and 20 telephone conferences was typical and characteristic of his efforts with other large telephone consumers to expand the amount of negotiations or other work to be performed by TMC. Even the language and phrases used was [sic] characteristic of Morency's other prospecting efforts.

Hoyer affidavit at ¶ 6.

Hoyer's extensive and contemporaneous notes support the description of the October 19, 1994, meeting given by Gilchrist, Goodyear's Assistant Controller. According to these notes, Morency asked whether Goodyear was negotiating with AT & T. Jobe, Goodyear's Telecommunication Director, told Morency that Goodyear was negotiating new rates and would be "finalizing the agreement with AT & T by the end of Nov [1994]." Jobe also told Morency that, as of the date of the phone conference, Goodyear had obtained agreement from AT & T for $840,000 a year in savings.[7]

Hoyer's notes show that Morency complimented Goodyear for obtaining "really good" discounts, "serious discounts." Morency then tried to convince Gilchrist that TMC could help Goodyear obtain additional savings. Morency said that TMC could give Goodyear information on "sweetheart deals around the country," including "copies of the tariffs." With this information, Morency argued that AT & T would give Goodyear near the best rate obtained by the biggest telecommunication purchasers.

In these notes, Hoyer recounts that Morency sought to represent Goodyear by promising to obtain specific information on other tariffs around the country. The notes suggest that Gilchrist agreed to allow Morency to participate in a conversation with AT & T's account representative to see "if there is some money we can shake out of this thing."[8]

**7.** Plaintiff's Exhibit 5, at TMC 1007.

**8.** Plaintiff's Exhibit 5, at TMC 1011.

On October 20, 1994, Morency and Hoyer of TMC, and Jobe of Goodyear, spoke by phone with Bob Boberg, AT & T's account representative for the Goodyear account. Again, Hoyer took extensive and contemporaneous notes.

In claiming that Plaintiff TMC is entitled to compensation from Goodyear, Morency says that his participation in this conversation was the cause of Goodyear's later success in contract negotiations with AT & T. However, the notes taken by TMC employee Hoyer do not support this claim.

In her notes, Hoyer shows Morency stating that TMC "wants to take the good work accomplished [by Goodyear and AT & T] on 552 [Contract Tariff] and work with you to improve on this." Hoyer's notes show that AT & T employee Boberg responded: "The door is open to Earl [Jobe] to renegotiate on that CT [contract] anytime he wants to do that."[9]

In the October 20, 1994, telephone conference, Morency then offered to help Boberg in approaching his AT & T supervisors with an argument for lower rates for Goodyear. Boberg responded: "I really have not had a problem dealing with ONA [AT & T office of national accounts] in the past so I'm not sure how it will help Goodyear." Morency then offered to put together a model of other contracts to provide to AT & T. Presumptively, Morency believed this model would influence AT & T to afford Goodyear lower rates.[10]

All evidence before the Court shows that Plaintiff TMC and Morency added nothing to Goodyear's negotiation with AT & T during this October 20, 1994, telephone call. To summarize the call, AT & T employee Boberg says AT & T had always been willing to discuss changes to Tariff 552, and that his national accounts supervisors had not been an obstacle to obtaining further discounts.

On October 21, 1994, TMC's Morency first spoke with Goodyear's Jobe about compensation for TMC's services. Jobe did not have power to enter an agreement for Goodyear. The evidence before this Court shows that TMC understood that Joe Gilchrist, Goodyear's Assistant Controller, needed to approve TMC's services.

In this conversation, Jobe stated that Plaintiff TMC would not receive any compensation on the first $50,000 of discounts obtained on AT & T's outbound service. In an October 21, 1994, fax, Jobe stated his understanding of the discussion of Plaintiff TMC's compensation:

> We presently have been offered 30% on domestic ports, 30% on U.S. global ports, and 38% on domestic PVC. Anything you can gain beyond those points we would consider to your credit.[11]

Understanding that any agreement for TMC's services would need approval from Assistant Controller Gilchrist, TMC's Hoyer sent a letter dated October 21, 1998, to Gilchrist to confirm an agreement. In that letter, Hoyer stated, in part:

> As per our conference call of October 19, 1994, Telephone Management Corporation will renegotiate, on behalf of Goodyear, all existing AT & T services and contracts. We will use the current rates and discounts contained in AT & T Contract Tariff 552 as the benchmark on which to base TMC's share of the savings. TMC will be compensated for any improvement in rates, discounts, bonuses, credits and/or financial enhancements over and above those currently utilized.[12]

Gilchrist and Jobe read the letter on October 27, 1994. Both Gilchrist and Jobe testify that Hoyer's letter misstated the relationship between Goodyear and Plaintiff TMC. Consequently, Goodyear rejected it through a letter dated October 31, 1994, written by Jobe. The letter reads in part:

> I received my copy of your 21 Oct [sic] letter to J H Gilchrist [sic] on Thursday the 27th and until today I had no opportunity to review it with Joe Gilchrist. In the letter there are several points which concern me:
>
> 1. It is not our intention that TMC will negotiate on behalf of Goodyear.

9. Plaintiff's Exhibit 7, at TMC 1016.

10. *Id.* at TMC 1017.

11. Plaintiff's Exhibit 8.

12. Exhibit 2 attached to Hoyer affidavit.

2. It is not our intention that all existing AT & T services and contracts be the subject of TMC's review.

3. Our contract is very specific on items which TMC is to receive compensation and your letter seems to expand on those items.

... It is our intention that TMC only act in areas which are specifically authorized by Goodyear because Goodyear cannot possibly discuss with TMC each and every one of the actions being taken by the Telecommunications Department.

**In order to avoid any confusion and misunderstanding, this letter is to notify you to stop any work on behalf of Goodyear, immediately.**

Until we have a clear, mutual understanding of the scope of this project and the manner in which TMC may qualify for compensation, you are directed to cease your work and notified [sic] that Goodyear will not accept any recommendation from TMC until this clear understanding is established.[13]

In summary, the evidence before the Court shows that TMC had a written contract with Goodyear that required written approval of TMC recommendations before TMC had right to compensation. In its past relationship with Goodyear, Plaintiff TMC had followed this policy.

The evidence shows that in 1994, Goodyear entered negotiations with AT & T for changes to Tariff 552. Such negotiations were part of a regular relationship between Goodyear and AT & T. While not completed, these negotiations were well underway when TMC's Morency sought an opportunity to be Goodyear's consultant in negotiations with AT & T. After TMC's October 19, 1994, effort to convince Goodyear to allow it to consult, Goodyear allowed Morency to participate in an October 20, 1994, conversation with Boberg, the AT & T employee responsible for the Goodyear account.[14]

In the conversation with Boberg, Morency promised "to put together a model for Goodyear & fax a copy to [AT & T]." Morency apparently suggested that this model of prices for other large telecommunication customers would influence AT & T to sweeten its position for Goodyear. However, Morency never sent such a model to Goodyear or to AT & T. Former TMC employee Hoyer testified as follows:

To my knowledge, following the October 20 telephone conference, TMC did not provide to Goodyear information about how it could obtain discounts in addition to those it had already obtained on the AT & T contract, nor did TMC provide Goodyear or AT & T copies of other contracts or tariffs that would help Goodyear to obtain greater discounts, nor did TMC perform negotiations on behalf of Goodyear as TMC indicated it would do in the October 19 telephone conference. It is my understanding that before any further steps were taken by TMC, Goodyear terminated all work between Goodyear and TMC.

Hoyer affidavit at ¶ 9.

The record here is without any evidence that Plaintiff TMC had any effect at all on the contract relationship between Goodyear and AT & T. In sum, TMC says that its offhand remark that rates had fallen 20% from the Tariff 552 rate, with the presence of an outside consultant, brought AT & T to its knees. To state the position is to display its lack of merit.

Goodyear is an extremely large telecommunication purchaser, spending more than $5 million in 1993 for telecommunication services. Goodyear had a long and good relationship with AT & T, involving near continual negotiations over changes in charges and services.

In contrast, Plaintiff TMC previously had never been involved in any negotiations between Goodyear and AT & T. Though TMC's

---

13. Plaintiff's Exhibit 9 (emphasis in original).

14. Importantly, no evidence shows that Morency or Plaintiff TMC brought anything to Goodyear's negotiations with AT & T. Instead, the AT & T representative Boberg stated the obvious: "The door is open to Earl [Jobe] to renegotiate on that CT [contract] anytime he wants to do that." No

evidence supports any claim that such renegotiation was not a part of Goodyear's longstanding relationship with AT & T, as reflected in the fact that Goodyear was in ongoing negotiations with AT & T. Even more important, the evidence before the Court shows that TMC brought nothing to the negotiations

wanted to enter the negotiation consultant field, it had little experience in this area. Very little of its 1994 revenues come from negotiations. Moreover, TMC was an extremely small player in the telecommunication field, having only a total of five to ten employees in 1994.

No evidence supports Plaintiff TMC's claim that its presence in the October 20, 1994, telephone conference with Boberg bowed AT & T to submission. First, TMC's Morency brought almost nothing to the conversation. As recorded in his company's notes, Morency stated nothing more important than that TMC "wants to take the good work accomplished on 552 Contract Tariff and work with you to improve on this." Beyond this, Morency offers to help Boberg in approaching his supervisors, assistance that Boberg says he has not needed and does not need. Finally, Morency offers to put together a model of other contracts to provide to AT & T, but he never did. No evidence shows any effect of Morency's participation in the conversation with AT & T's Boberg.

Finally, the time of negotiations belies any relationship between TMC's acts and AT & T's later change of Tariff 552. As described, TMC and Morency had only extremely brief contact with AT & T's Boberg on October 20, 1994. By October 31, 1994, Goodyear's Telecommunications Director Jobe told Plaintiff TMC that it was not to do any negotiation work.

The negotiations between AT & T and Goodyear over a change in the Tariff 552 rate did not reach agreement until October 1995, almost twelve months after Morency's one-time contact on October 20, 1994.[15]

## II. Standard of Review

■ Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 245 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections,* 141 F.3d 252, 258–59 (6th Cir.1998).

Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505.

## III. Discussion

### A. Choice of Law

Plaintiff Telephone Management Corporation filed this diversity action in Oregon. On May 6, 1998, the Oregon district court transferred the case to this Court on the grounds of forum non conveniens.[16]

In *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the United States Supreme Court stated the rule:

---

**15.** On October 17, 1995, AT & T presented a formal offer to Goodyear for a five-year SDN One–Net and DCS Contract Tariff covering both SDN outbound service and 1–800 toll free inbound service, both domestic and international. The offer would replace Goodyear's existing Contract Tariff 552. On October 18, 1995, Goodyear telecommunication director Jobe wrote to AT & T accepting the SDN One–Net Contract Tariff proposal.

**16.** 28 U.S.C. § 1404(a) provides:

(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms. *Id.* at 639, 84 S.Ct. 805. *See also Martin v. Stokes,* 623 F.2d 469, 471 (6th Cir.1980).

 Under *Van Dusen,* this Court applies the choice of law rules of Oregon.[17] Oregon's choice of law analysis asks which state has the most substantial interest in having its law applied and which state has the most significant relationship to the case. *Lilienthal v. Kaufman,* 239 Or. 1, 395 P.2d 543 (Ore.1964) (en banc). The law of the place of contract " 'must govern as to the validity, interpretation, and construction of the contract.' " *Id.* at 545 (quoting *Jamieson v. Potts,* 55 Or. 292, 105 P. 93, 95 (1910)). Because they entered any contract between Plaintiff TMC and Goodyear in Ohio, Oregon choice of law rules requires use of Ohio law.

Oregon also uses a "most significant relationships" test. *Lilienthal,* 395 P.2d at 545. Under this test, Ohio has the most significant relationship to the claims. Section 188(2) of the Restatement of Conflicts of Laws addresses circumstances where, as in the present case, the contract omits a choice of law provision:

> In the absence of an effective choice of law by the parties ... the contacts to be taken into account ... to determine the law applicable to an issue include:
>
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to a particular issue.

Restatement (Second) of Conflicts of Laws, § 188(2), at 575 (1971).

Except for "place of business," each of the Restatement factors favors Ohio, and none of the factors favors Oregon. The Court finds that, under Oregon choice of law rules, Ohio law should control.

**B. Breach of contract claim**

 Plaintiff TMC's first claim is for breach of contract. A breach of contract is a failure without legal excuse to perform any promise that forms a whole or a part of a contract. *National City Bank v. Erskine & Sons, Inc.,* 158 Ohio St. 450, 461, 110 N.E.2d 598 (1953) (citation omitted). Generally, a plaintiff must show the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994) (citing 2 Ohio Jury Instructions (1993), § 253.01, at 111–112; *American Sales, Inc. v. Boffo,* 71 Ohio App.3d 168, 175, 593 N.E.2d 316 (2d Dist.1991) (identifying the elements required to effectively plead a breach of contract claim)).

As described above, Plaintiff TMC shows no facts showing agreement regarding TMC representing Goodyear in negotiations with AT & T, nor what the terms of any representation would be. Instead, TMC's Morency pitched that he could help Goodyear and Goodyear's Assistant Controller Gilchrist allowed him to participate in the October 20, 1994, conversation.

TMC's former employee Janis Hoyer described the circumstances:

> Morency told the Goodyear representative that, if hired, he would be able to improve Goodyear's contract with AT & T. In an attempt to establish credibility, Morency asked Goodyear to set up a conference on

---

17. In *Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990), the Supreme Court discussed its continued adherence to *Van Dusen:*

> We thus held that the law applicable to a diversity case does not change upon a transfer initiated by a defendant. The quoted part of *Van Dusen* reveals three independent reasons for our decision. First, § 1404(a) should not deprive parties of state-law advantages that exist absent diversity jurisdiction. Second, § 1404(a) should not create or multiply opportunities for forum shopping. Third, the decision to transfer venue under § 1404(a) should turn on considerations of convenience and the interest of justice rather than on the possible prejudice resulting from a change of law.

494 U.S. at 523.

October 20 to introduce himself (and TMC) to Bob Boberg, the AT & T representative who worked with Goodyear.... During the October 20 telephone conference, Morency attempted to develop a rapport with Boberg.

Hoyer affidavit at ¶¶ 7–8.

All the evidence shows that TMC was "prospecting" a new service that it wished to offer Goodyear. The October 20, 1994, telephone conference was an effort by TMC to show that such service would be of value to Goodyear.

Instead of showing that TMC could add value to Goodyear's negotiations with AT & T, the evidence shows Morency's participation had no effect. Rather, the evidence shows the obvious: before TMC got involved, AT & T had always been willing to renegotiate Tariff 552.

Plaintiff TMC fails to show it ever agreed with Goodyear for representation. TMC proposed contract terms for such representation in its letter from Janis Hoyer dated October 21, 1994. Goodyear Telecommunications Director Jobe rejected TMC's offer in its October 31, 1994, letter. *Foster v. Ohio State University,* 41 Ohio App.3d 86, 88, 534 N.E.2d 1220 (10th Dist.1987) (stating that "[a] reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.") (citation omitted).

There can be no binding contract unless it first appears that acceptance of the offer proposed was received by the offeror. Then it must establish that "the acceptance was identical with the offer and unconditional; if it is conditional or introduces a new term, it constitutes merely expression of willingness to treat or a counter proposal, and does not complete the contract." *Schiff v. Schiff,* 45 N.E.2d 132, 136 (Ohio App. 2d Dist.1942) (citation omitted).

In *Garrison v. Daytonian Hotel,* 105 Ohio App.3d 322, 663 N.E.2d 1316 (2d Dist.1995), the court described the rule as follows:

As a part of that meeting of the minds, there must be a definite offer on one side and an acceptance on the other.... "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." 1 Restatement of the Law 2d, Contracts (1981), Section 24. An offer is binding on the offeror when accepted by the offeree. An offer remains open for acceptance by the offeree until it is revoked by the offeror, rejected by the offeree, or until the time for its acceptance has expired. Id., Section 36.

When an offer is rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative to bind the offeror. A rejection is implied in a counteroffer, which is "interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on the terms stated in his counteroffer, but by implication that he will not assent to the terms of the original offer." 1 Williston On Contracts (4 Ed. Lord Ed.1990) 631, Section 5:3. An offeree's power to conclude the bargain through his acceptance of the offer is, therefore, terminated by his making of a counteroffer. Restatement, supra, Section 39(2).

105 Ohio App.3d at 325, 663 N.E.2d 1316.

Plaintiff TMC argues that it is entitled to compensation under the same terms as shown in its 1992 contract with Goodyear. However, the 1992 contract dealt with a completely different service and was entered under completely different conditions.

The 1992 contract called for TMC to review past billing and make suggestions for charges that were improperly billed and paid. In contrast, the 1994 negotiations were part of Goodyear and AT & T's continual negotiations over the broad range of services provided by AT & T.[18]

Plaintiff TMC does not show evidence of any contract such that would entitle TMC to enforce it.

---

18. As AT & T account representative Boberg testified:

Q. So you wouldn't deny that you stated in that [October 20, 1994] conversation that the door was open to Earl Jobe and/or Goodyear to renegotiate if that's what they wanted to do?

A. Absolutely, it was open. It was open prior to, during and after.

Boberg deposition at 42 (emphasis added).

■ As a separate matter, Plaintiff TMC does not give evidence that it was damaged by any breach of contract. TMC claims it is entitled to 33% of Goodyear's dollar savings resulting from TMC's recommendations for 36 months following the use of each such recommendation. TMC claims right to 33% of the savings realized by Goodyear as the result of its renegotiation of the tariff with Goodyear. Having made such a claim, it is necessary for TMC to show that Goodyear obtained dollar savings as the result of TMC recommendations. TMC fails to show evidence to support this.

First, no credible evidence shows that Plaintiff TMC made any recommendations that Goodyear followed or used to reopen negotiations with AT & T. Rather, the evidence shows that Goodyear had already begun renegotiating with AT & T and, on its own, had obtained a significant price reduction. Moreover, TMC's suggestion that the recommendation to negotiate price was novel is untenable. All participants knew phone service prices were falling. AT & T had renegotiated many rate reductions with Goodyear over the years and was doing so again when TMC inserted itself.[19]

Second, under the 1992 contract between Defendant Goodyear and Plaintiff TMC, Goodyear required all recommendations to be in writing and accepted in writing. There is no evidence that Goodyear accepted TMC's recommendations in writing.

Equally important, no evidence shows that the participation of TMC's Morency in the October 20, 1994, phone conference call with Boberg had any effect. In the call, Morency said the following:

In 20 years we have never recommended that any client leave AT & T. We believe AT & T is the finest service provider. We want to help work with OANA [an AT & T division].... We specialize, because of the experience we have with our other clients, in getting the best discounts and rate. We

have looked at CT 552 [Contract Tariff Number 552] and want to take the good work accomplished on 552 and work with you to improve on this.... We are going to put together a model for Goodyear and fax a copy to you.[20]

From this single conversation, TMC makes the implausible claim that rate reductions obtained a year later and after long negotiations resulted. Plaintiff TMC also makes the dubious argument that TMC's suggestion that rates were falling, perhaps by as much as 20% from the Tariff 552 rate caused later and favorable terms from AT & T.

TMC claims that its participation in this conversation caused Goodyear's tariff reduction, though TMC had only five to ten employees at the time, had no significant experience in negotiating such contracts, and that Goodyear was a large AT & T customer with more than $5 million in annual billings. The argument lacks merit.

Moreover, there is no evidence that Goodyear was furnished, or used, any specific proprietary information or advice of TMC. That is, no evidence shows that any savings obtained by Goodyear from AT & T are attributable to TMC's efforts. On the contrary, the evidence shows that Goodyear was well-involved in negotiations for a new contract tariff with AT & T long before October 1994, wholly independent of any information, advice, or other efforts purportedly provided by TMC.

No evidence shows that anything Plaintiff TMC did had any effect upon rate reductions that Goodyear obtained from AT & T in October 1995. Accordingly, Plaintiff TMC's breach of contract claim fails.

C. Breach of duty of good faith claim

■ In its second claim for relief, Plaintiff TMC alleges breach of the implied covenant of good faith and fair dealing (Count II). Under Ohio law, such a duty is recognized in contract settings only in the relationship between insurers and their insureds. Apart from such a relationship, a party cannot recast a contract claim as a tort claim.

---

**19.** AT & T employee Boberg testified that AT & T and Goodyear had "renegotiated them [the rates with Goodyear] at least one time since then [since the first renegotiation of the 552 Contract Tariff], maybe twice since then."

Robert Boberg deposition at 56.

**20.** Plaintiff's Exhibit 7, at TMC 1016.

In *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Ass'n,* 54 Ohio St.3d 1, 7, 560 N.E.2d 206 (1990), the Supreme Court of Ohio described this policy:

> The law of torts is well equipped to offer redress for losses suffered by reason of a 'breach of some duty imposed by law to protect the broad interests of social policy.' *Kamlar [Corp. v. Haley* (1983) ], 224 Va. [699] at 706, 299 S.E.2d [514] at 517. Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts. . . .
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Therefore, applying the Restatement in this context will encompass liability that is otherwise best suited for contract negotiation and assignment.

54 Ohio St.3d at 7, 560 N.E.2d 206 (quoting *Sensenbrenner v. Rust, Orling & Neale,* 236 Va. 419, 374 S.E.2d 55, 58 (1988)).

■ TMC's relationship with Goodyear is solely contractual. In light of it having only a contractual relationship, TMC cannot rework its claim as a tort claim. Therefore, Goodyear is entitled to summary judgment on Plaintiff TMC's claim for breach of an implied covenant of good faith and fair dealing.

### D. Unjust enrichment claim

■ Plaintiff TMC makes a third claim for relief on *quantum meruit,* or unjust enrichment, grounds (Count III). These doctrines "give rise to obligations imposed by law, irrespective of the intentions of the parties, to prevent an injustice when one party retains a benefit from another's labors." *Pawlus v. Bartrug,* 109 Ohio App.3d 796, 800, 673 N.E.2d 188 (9th Dist.1996). *See also Rice v. Wheeling Dollar Sav. & Trust Co.,* 155 Ohio St. 391, 397, 99 N.E.2d 301 (1951) (citing *Hummel v. Hummel,* 133 Ohio St. 520, 525, 14 N.E.2d 923 (1938) (describing classes of contracts)).

■ To maintain a cause of action for unjust enrichment under Ohio law, the plaintiff must allege: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n,* 913 F.Supp. 1031, 1042 (N.D.Ohio 1996); *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984) (per curiam) (describing elements for quasi-contract).

■ To make such a claim, Plaintiff TMC must establish that it conferred a benefit upon Goodyear; that Goodyear knew of the benefit conferred; that the circumstances render it unjust to permit Goodyear to retain the benefit without payment; and that the reasonable value of the benefit conferred can be shown. *Id.*

Plaintiff TMC fails to show facts sufficient to support its claim of unjust enrichment. First, no material evidence shows that TMC conferred any benefit upon Goodyear. TMC's only substantive contact with the negotiations was the October 20, 1994, telephone conference with AT & T's Boberg and Goodyear's Jobe.

Goodyear did not seek TMC's assistance. In fact, at the time, the working relationship between Goodyear and AT & T was good and their various contract negotiations were going smoothly. During the conference call at the core of this dispute, TMC did not give Goodyear any detailed analysis. Instead, the evidence shows that TMC's involvement was a bid to act on Goodyear's behalf. When TMC put the proposal in writing, Goodyear rejected it. Consequently, TMC conferred no benefit.

Apart from this, Plaintiff TMC's only claimed benefit to Goodyear is Morency's broad statement that Goodyear should obtain a 20% reduction in the rates contained in Tariff 552. However, such a statement is too generalized to benefit Goodyear. Also, Goodyear had already received reductions of more than 30% in its own negotiations with AT & T.[21] No material evidence shows Plain-

---

**21.** On October 21, 1994, TMC's Hoyer wrote Goodyear's Gilchrist what she described as a

tiff TMC provided any benefit to Goodyear by suggesting that Goodyear could hope a 20% reduction.

Even if Goodyear had received some benefit, equity does not require that Goodyear pay TMC. Plaintiff TMC interjected itself into ongoing negotiations in an attempt to obtain work. Without any clear agreement about what services it would provide or how Goodyear would compensate it, TMC made a generalized prediction that Goodyear could expect a rate reduction of 20% from the Tariff 552 rates. In an environment of generally falling rates, this prediction had almost no value.

Similarly, they do not show the participation of TMC, an operation with no significant history of negotiating major telecommunication contracts, to have given Goodyear any leverage in its negotiations with AT & T. Equity does not require Goodyear to pay TMC anything.

For these reasons, Goodyear is entitled to judgment on TMC's claim for *quantum meruit.*

### E. Claim for misrepresentation

■ In its fourth claim, Plaintiff TMC seeks an award of damages for fraud or intentional misrepresentation (Count IV). In making this claim, TMC is not clear what statements Goodyear purportedly fraudulently made. Apparently, TMC claims that on October 19, 1994, Goodyear Assistant Controller Gilchrist told TMC's Morency: "Well, I don't know if you will be able to do that, but if there's some money we can shake out of this thing, let's go for it." Apparently, TMC claims Goodyear invited TMC's participation without intending to pay for it.

■ This claim fails. In Ohio, a claim of common-law fraud requires proof of the following elements: (a) a representation or, where there is a duty to disclose, conceal-

ment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance. *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991).[22]

Plaintiff TMC does not show any false statement or misrepresentation ·made with knowledge of its falsity. At best, Goodyear's Gilchrist invited TMC's attendance in a telephone call with AT & T representative Boberg without any express agreement about what claim TMC would make for compensation. When Plaintiff TMC proposed to represent Goodyear in all negotiations with AT & T for 33% of the savings on the Tariff 552 rates, Gilchrist rejected TMC's participation. These circumstances do not show fraud and intentional misrepresentation.[23]

The Court thus finds that Plaintiff TMC fails to show facts that would support a claim for fraud or intentional misrepresentation. The Court therefore grants Defendant Goodyear's motion for judgment as to Plaintiff TMC's fourth claim.

### F. Misappropriation of trade secrets

■ In its fifth claim, Plaintiff TMC alleges that Goodyear misappropriated TMC's trade secrets (Count V). In making this claim, Plaintiff TMC says Goodyear wrongly used TMC's proprietary information. Defendant Goodyear denies that any information it obtained from TMC was a trade secret, or that it wrongly used any such information.

■ In deciding if information is a trade secret subject to protection, this Court exam-

---

contract proposal. In it, Hoyer proposed the following:

Further, TMC agrees to negotiate a frame relay services agreement with TMC's contingent billing beginning after the following previously offered AT & T discounts have been fulfilled:
30% on domestic ports
30% on U.S. global ports
38% on domestic PVC
Exhibit 2, attached to Hoyer affidavit.

**22.** *See also Burr v. Stark Cty. Bd. of Comm'rs.,* 23 Ohio St.3d 69, 491 N.E.2d 1101 (syllabus at ¶ 2) (1986) (same); *Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984) (per curiam) (same).

**23.** The plaintiff in this case seeks relief on grounds of intentional misrepresentation as opposed to a claim for negligent misrepresentation. See Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 17–18.

ines: (1) whether the information is otherwise known or available; (2) what precautions TMC used to guard the secrecy of the information; (3) the value of the information among TMC's competitors; (4) the time and effort expended to obtain the claimed secret; (5) the time and effort others would need expend to otherwise get the information; and (6) whether TMC treated the information as confidential. *Water Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85–86, 472 N.E.2d 715 (1984).

After considering these factors, the Court finds that no facts show that the information conveyed by TMC to Goodyear was a trade secret subject to protection. First, the information was not a type of specific information. TMC told Goodyear that the rates in Tariff 552 were approximately 20% higher than market rates. This was not special information. Goodyear knew that market rates had fallen, had already negotiated with AT & T, and had obtained major concessions.

Second, Morency's general statement that comparable rates had fallen approximately 20% was not protected in any way by TMC. Plaintiff TMC never tried to limit Goodyear's distribution of this information even if it did have value. The statement is general and does not seem to have affected Goodyear's negotiation with AT & T.

At the time of the October 19, 1994 conversation, AT & T had already offered Goodyear a 30% reduction on domestic ports, a 30% reduction on U.S. global ports, and a 38% reduction on domestic PVC. At a time when Goodyear had already obtained a 30% rate reduction from AT & T, information that it could obtain a 20% rate reduction was of no value to Goodyear. Such information is akin to a claimed trade secret that one can buy a car for $25,000 at a time when one has already been offered the car for $20,000.

Plaintiff TMC fails to show evidence to support its claim that Defendant Goodyear misappropriated any trade secret. Therefore, Defendant Goodyear is entitled to judgment as to Plaintiff TMC's claim for misappropriation of trade secrets.

### IV. Conclusion

For the reasons discussed above, Defendant Goodyear is entitled to judgment as a matter of law. Accordingly, the Court grants Defendant Goodyear's motion for summary judgment and enters judgment dismissing Plaintiff TMC's action.

IT IS SO ORDERED.